120 F.3d 623
 45 ERC 1197, 27 Envtl. L. Rep. 21,421
 SIERRA CLUB; Citizens for Buckeye Basin Parks, Inc.;
Friends of Mulberry Park; Rick B. Van Landingham, III;
Gene Cook; Sandy James; Robert Wayne James; Helen Martin;
Henry Martin; Emilie Martin; Edward Knapp; Anthony P.
Urbanski; Jeannine Urbanski; Maryann Hollaway; Mara
Hollaway, Plaintiffs--Appellants,
v.
Rodney SLATER, Secretary, United States Department of
Transportation; Robert D. Bush, Executive Director,
Advisory Council on Historic Preservation; Fred J. Hempel,
Division Administrator, Federal Highway Administration; W.
Ray Luce, Director, Ohio Historical Preservation Office;
Jerry Wray, Director, Ohio Department of Transportation;
William Knight, Director, Toledo Metro Area Council of
Governments; Carleton S. Finkbeiner, Mayor, City of
Toledo; Donald Schregardus Director, Ohio Environmental
Protection Agency; Togo D. West, Jr., Secretary, Department
of the Army Corps of Engineers, Defendants--Appellees.
 No. 96-3295.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 27, 1997.
Decided Aug. 6, 1997.
Rehearing and Suggestion for Rehearing En Banc Denied Oct. 15, 1997.
 
 Terry J. Lodge (argued and briefed), Toledo, OH, for Plaintiffs-Appellants.
 Ralph J. Lewis, Office of the U.S. Attorney, Western Division, Toledo, OH, Robin N. Michael, Environmental & Natural Resources Division, Department of Justice, Washington DC, Lisa E. Jones (argued), Department of Justice, Environment & Natural Resources Division, Washington, DC, Jacques B. Gelin (briefed), Robin L. Juni, Cecilia E. Kim, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Rodney Slater, Robert D. Bush, Fred J. Hempel, and Togo D. West, Jr., Defendants-Appellees.
 Fred J. Milligan, Jr., Milligan & Milligan, Westerville, OH, Andrew J. Ayers (briefed), Meister, Ayers & Meister, Toledo, OH, for W. Ray Luce, Defendant-Appellee.
 Frederick C. Schoch, Asst. Attorney Gen., (argued and briefed), Ellen B. Leidner (briefed), Office of the Attorney General, Transportation Section, Columbus, OH, for Jerry Wray, Defendant-Appellee.
 Terrence K. Davis, John F. Hayward, Shumaker, Loop & Kendrick, Toledo, OH, for William Knight, Defendant-Appellee.
 Lawrence J. Kiroff (briefed), Lourdes Santiago, Senior Attorney (briefed), Office of the City of Toledo Law Department, Toledo, OH, for Carleton S. Finkbeiner, Defendant-Appellee.
 Lisa E. Jones (argued), Department of Justice, Environment & Natural Resources Division, Washington, DC, Robin L. Juni, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Donald Schregardus, Defendant-Appellee.
 Before: CONTIE, RYAN, and BOGGS, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 The Sierra Club and other plaintiffs brought suit against federal, state, and municipal officials in their official capacities under numerous federal statutes, seeking to prevent the construction of an urban corridor development project known as the Buckeye Basin Greenbelt Project, also known simply as the Project, in Toledo, Ohio. The centerpiece of the Project is an approximately 3.5-mile-long four-lane highway connecting downtown Toledo and its northern suburbs, and is referred to as the Parkway. Currently, construction on the Project is scheduled to be completed in mid-1998.
 
 
 2
 The district court granted summary judgment to the defendants with regard to all of the plaintiffs' claims. The plaintiffs now appeal, raising numerous issues. Concluding that their assignments of error are uniformly without merit, we will affirm the district court's judgment.
 
 I.
 
 3
 About twenty-five years ago, in 1972, planning commenced for the highway project at the center of this lawsuit. Federal funding was first requested in 1974.
 
 
 4
 The parties do not agree what, precisely, constitute the components of the Project as a whole. All agree that the centerpiece is the Parkway, which is meant to serve as a connection between downtown Toledo, I-280, and Point Place, in the northern suburbs of Toledo, and is intended to provide commercial, industrial, and residential development in North Toledo. But while all parties agree that the City of Toledo has contemplated certain other construction projects, they disagree whether those projects are properly considered part of the Project. According to the defendants, the Project consists of nothing other than the Parkway; a paved bikeway paralleling part of the Parkway; and an extension of Champlain Street from its current northeastern terminus beyond I-280, called the Champlain Extension. The plaintiffs claim that two other construction projects--a paved connection of the Anthony Wayne Trail and I-75 with the Parkway through the Central Business District of Toledo, called the CBD Connection or CBD Connector, and a Development Scheme including, among other things, four industrial parks--are also part of the Project, despite the defendants' contention that these are separate and distinct endeavors. The defendants point out that no federal funding has ever been received, or even sought, for these projects, and that no federal permit or certification has ever been requested. The defendants also claim that it is "currently unlikely" these projects "will ever come to fruition."
 
 
 5
 Because the Project required federal funds, it was necessary to comply with the National Environmental Policy Act of 1969, or NEPA, 42 U.S.C. § 4321 et seq., which requires that an environmental impact statement, or EIS, be filed before any major federal action is undertaken that will significantly affect the environment. The Federal Highway Administration, or FHWA, delegated preparation of the EIS to the Ohio Department of Transportation, which in turn delegated responsibility for the necessary environmental studies to the City of Toledo. A draft EIS was completed in 1981, and the final EIS was approved by FHWA in February 1984. In April 1984, the FHWA then issued a Record of Decision, or ROD, memorializing its approval.
 
 
 6
 Another environmental consideration arose because the Parkway is intended to run through the Buckeye Basin, which contains naturally occurring wetlands. The Project is, therefore, subject to federal laws that prohibit federally subsidized construction in wetlands unless there is no practical alternative, and unless all practical measures to minimize harm to the wetlands have been taken. Federal law requires that a party seeking to place fill material in a wetland must first obtain a special permit from the Army Corps of Engineers, called a § 404 permit. However, at an early stage of the Project, the Corps concluded that the Buckeye Basin wetlands benefitted from an exception to this general rule, because they were covered by a nationwide permit authorizing the filling of isolated wetlands of less than ten acres under certain circumstances, and rendering unnecessary a § 404 permit. Almost ten years later, however, in 1989, the Corps altered this determination following a change in the legal definition of "wetlands," and concluded that a § 404 permit was necessary. The City applied for the requisite permit in 1990, and it was granted in 1992. The Corps determined that some impact on the wetlands was unavoidable, and so, the permit was conditioned on the implementation of a wetland mitigation plan, intended to minimize any negative effects.
 
 
 7
 More than three years elapsed between the approval of the final EIS and the inception of construction on the Project. Consequently, it was necessary under the regulations for the FHWA to prepare a written reevaluation of the EIS. The purpose of the reevaluation was to determine whether a supplemental EIS was required. The reevaluation discussed the impact of the Project on the wetlands, certain hazardous waste implications, and design modification measures; it also reevaluated the environmental impacts previously considered in the final EIS. After performing the reevaluation, the FHWA determined in January 1995 that no supplemental EIS was required.
 
 
 8
 In June 1995, the plaintiffs filed a five-count complaint in federal court against various federal, state, and municipal defendants, alleging that the Project violated NEPA, 42 U.S.C. § 4321 et seq. (Counts I and II); § 4(f) of the Federal-Aid Highway Act, 23 U.S.C. § 138 (Count III); the National Historic Preservation Act, or the NHPA, 16 U.S.C. § 470 (Count IV); and the Intermodal Surface Transportation Efficiency Act of 1991, or ISTEA, 23 U.S.C. § 134(l), and the Clean Air Act, 42 U.S.C. § 7401 et seq. (Count V). Four months later, plaintiffs filed an amended complaint adding a Count VIII, although the pleading contained no Counts VI and VII, alleging violations of § 404 of the Clean Water Act, 33 U.S.C. § 1344; § 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403; and of NEPA and the NHPA. The amended complaint names, as federal defendants, the Secretary of the United States Department of Transportation, officials of the Federal Highway Administration and the Advisory Council on Historic Preservation, and the Secretary of the Army Corps of Engineers. The state defendants are the Ohio Historical Preservation Office, the Ohio Department of Transportation, and the Ohio Environmental Protection Agency. Finally, the municipal defendants are the Toledo Metro Area Council of Governments and the Mayor of the City of Toledo.
 
 
 9
 The district court ruled on a number of pretrial motions, including the motions for summary judgment filed by various defendants, which it granted. Sierra Club v. Pena, 915 F.Supp. 1381 (N.D.Ohio 1996). A motion for supplementation of the record, filed by the plaintiffs, was granted in part and denied in part. While those determinations are challenged in this appeal, the plaintiffs do not take issue with the district court's determination that two of their claims in Count V, brought under ISTEA, were barred because no private right of action under ISTEA exists. Id. at 1390-91. The plaintiffs likewise do not complain of the district court's denial of their motion to file a second amended complaint.
 
 II.
 A.
 
 10
 We begin with the plaintiffs' claim that the district court erred in holding that many of the plaintiffs' claims are time-barred. The district court reasoned that the plaintiffs' so-called NEPA claims were, in actuality, brought under the Administrative Procedure Act, 5 U.S.C. §§ 701-06, since NEPA itself provides no private right of action. The court then reasoned that APA actions were subject to the six-year statute of limitations imposed by 28 U.S.C. § 2401(a).
 
 
 11
 The court then undertook to determine which, in particular, of the plaintiffs' claims were barred by the six-year limitations period, and concluded that (1) Count I, alleging NEPA violations in the preparation of the final EIS, became ripe for review on the date of the issuance of the ROD memorializing the final approval of the EIS, April 16, 1984, and thus, was time-barred in its entirety; (2) Count II, alleging a failure to supplement the EIS, was not time-barred, because the claim accrued in January 1995 when the FHWA determined that no supplement was necessary; (3) Count III was time-barred with respect to allegations that the USDOT violated 23 U.S.C. § 138 in 1984 when it issued the ROD, but not with respect to allegations that the USDOT violated that same statute in 1995 when it reevaluated the Project; (4) Count IV, alleging an improper delegation of responsibilities under the NHPA at the time of the preparation of the EIS, was time-barred; (5) Count V, alleging violations of the Clean Air Act in connection with the defendants' failure to include the CBD Connector in the Project when the EIS was prepared, was time-barred; and (6) Count VIII was not time-barred insofar as it alleged that the § 404 permit issued in 1992 was improperly granted, but was time-barred insofar as it alleged improprieties in the 1979 determination by the Corps that no special permit was required, and insofar as it alleged that the City improperly filled the wetlands in 1988. In sum, the district court disposed of Counts I, IV, and V in whole because of statute-of-limitations problems, and disposed of Counts III and VIII in part. Count II was not time-barred either in whole or in part.
 
 
 12
 On appeal, the plaintiffs argue that because NEPA contains no statute of limitations, and because NEPA creates an equitable remedy, the only applicable time limitation is that imposed by the doctrine of laches. They argue, in the alternative, that even if a six-year limitations period applies, it should not be "mechanically" enforced. They also take the position, without citation to authority, that there was no final agency action until 1995, at which time the FHWA authorized ODOT to proceed using federal funds, because only then did the project "bec[o]me irrevocable." Finally, they assert, the ROD issued in 1984 was not a final agency action, or rather, it somehow became un-final by virtue of the fact that it was later necessary to evaluate the necessity for a supplemental EIS.
 
 
 13
 Whether the district court correctly concluded that the plaintiffs' claims were barred by the applicable statute of limitations is a question of law for plenary review by this court. See Wind River Mining Corp. v. United States, 946 F.2d 710, 712 (9th Cir.1991).
 
 
 14
 Section 102(2)(C) of NEPA requires that federal agencies prepare a detailed EIS for every "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); see 40 C.F.R. § 1502.1-.25.
 
 
 15
 NEPA does not work by mandating that agencies achieve particular substantive environmental results. Rather, NEPA promotes its sweeping commitment to "prevent or eliminate damage to the environment and biosphere" by focusing Government and public attention on the environmental effects of proposed agency action. By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct.
 
 
 16
 Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 371, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989) (citation omitted). NEPA itself does not contain a statute of limitations, see Park County Resource Council, Inc. v. United States Dep't of Agric., 817 F.2d 609, 617 (10th Cir.1987), and many courts, including this one, have routinely applied the laches doctrine when faced with timeliness challenges to NEPA actions, see Environmental Defense Fund v. TVA, 468 F.2d 1164, 1182 (6th Cir.1972). These courts have never, however, explicitly addressed the issue of whether NEPA suits are subject to some other time limitation, such as the general six-year statute of limitations of the Tucker Act, 28 U.S.C. § 1491, which contains the following general six-year statute of limitations:
 
 
 17
 [E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.
 
 
 18
 28 U.S.C. § 2401(a).
 
 
 19
 As we have said, NEPA does not authorize a private right of action. See Sierra Club v. Penfold, 857 F.2d 1307, 1315 (9th Cir.1988). The Administrative Procedures Act, however, provides for judicial review of agency action. 5 U.S.C. § 702. We have long recognized that federal courts have jurisdiction over NEPA challenges pursuant to the APA, see Environmental Defense Fund, 468 F.2d at 1171, and so have many other courts, see, e.g., Public Citizen v. United States Trade Representative, 5 F.3d 549, 551 (D.C.Cir.1993); Sierra Club, 857 F.2d at 1315.
 
 
 20
 Like NEPA, the APA does not contain a specific limitations period. See Sierra Club, 857 F.2d at 1315. Numerous courts have held, however, that a complaint under the APA for review of an agency action is a "civil action" within the meaning of section 2401(a). See, e.g., Wind River, 946 F.2d at 712. These courts have held that the six-year statute of limitations in section 2401(a), therefore, applies to the APA. See Daingerfield Island Protective Soc'y v. Babbitt, 40 F.3d 442, 445 (D.C.Cir.1994); Sierra Club, 857 F.2d at 1315.
 
 
 21
 It appears to us beyond question that the plaintiffs' action was brought pursuant to the APA; indeed, they do not suggest otherwise. It likewise appears beyond question that the six-year statute of limitations of section 2401(a) applies to actions brought pursuant to the APA. Again, the plaintiffs do not directly suggest otherwise, despite pleading that the statute of limitations should not be applied "mechanically." Mechanical application, however, is generally the sine qua non of a statute of limitations, and while the plaintiffs conclusorily allege malfeasance by the defendants, they do not articulate an equitable-tolling argument.
 
 
 22
 The next question we must address, then, is when did the plaintiffs' right of action first accrue. The plaintiffs, to prevail on this issue, must show that their action first accrued at some time later than the issuance of the ROD. Indeed, they argue that their claim accrued at the time the FHWA decided not to issue a supplemental EIS.
 
 
 23
 Under the APA, a right of action accrues at the time of "final agency action." 5 U.S.C. § 704. In determining whether a particular agency action is final, "[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Franklin v. Massachusetts, 505 U.S. 788, 797, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992). Although this court has never addressed the question, it appears well-established that a final EIS or the ROD issued thereon constitute the "final agency action" for purposes of the APA. See, e.g., Oregon Natural Resources Council v. Harrell, 52 F.3d 1499, 1504 (9th Cir.1995); Steubing v. Brinegar, 511 F.2d 489, 495 (2d Cir.1975). See generally Limerick Ecology Action, Inc. v. United States Nuclear Regulatory Comm'n, 869 F.2d 719 (3d Cir.1989).
 
 
 24
 The plaintiffs simply offer no case-law support for their position that the relevant final agency action occurred at the time the FHWA opted not to issue a supplemental EIS. Their position, moreover, defies logic because they complain of actions taken by the FHWA at the time the final EIS was approved and the ROD was issued. We, therefore, reject their arguments, and conclude that the district court correctly dismissed the various claims described above on the ground that they were time-barred.
 
 B.
 
 25
 Our disposition of the statute of limitations issue largely resolves the plaintiffs' next argument: that the Project was improperly "segmented" because of the exclusion of two projects, the so-called CBD Connector and the Development Scheme, from the 1984 final EIS, and their related assertion that these alleged aspects of the Project were likewise improperly excluded at the time of the 1990 application for a § 404 wetlands permit.
 
 
 26
 It is unnecessary to address the merits of the plaintiffs' segmentation claims, even though they arise both in the context of their time-barred complaints about the EIS and their non-time-barred complaints about the § 404 process. Fundamentally, the plaintiffs complain that when the Project was formulated, it improperly excluded the CBD Connector and the Development Scheme. The formulation of the Project occurred at or before the time of the EIS. Interestingly, the plaintiffs themselves assert that the segmentation occurred at a "critical" meeting in 1979. If there were any impropriety in the exclusion of the two additional projects, the resulting claim arose at that time, and is now time-barred. There was no repetition of the alleged wrongdoing in 1990 at the time of the § 404 permit, as that permit application was founded on the scope of the Project as it was framed in the EIS.
 
 C.
 
 27
 The district court rejected the plaintiffs' claim, raised in Count II of their complaint, that the defendants should have supplemented the EIS. When reviewing an administrative agency's final decision under the APA, we review the district court's summary judgment decision de novo, while "applying the appropriate standard of review to the agency's decision." Schuck v. Frank, 27 F.3d 194, 197 (6th Cir.1994). Here, the appropriate standard of review is that we set aside the agency determination only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. See Marsh, 490 U.S. at 375, 109 S.Ct. at 1860; Communities, Inc. v. Busey, 956 F.2d 619, 623 (6th Cir.1992); see also 5 U.S.C. § 706(2)(A) & (D).
 
 
 28
 The plaintiffs argue that the district court was simply mistaken in stating that detailed scientific study supported the decision that the supplement was unnecessary, because the court improperly relied on the Reevaluation Environmental Impact Study in reaching this conclusion. We understand that they contend various adverse effects were not adequately taken into account: 1) the replacement of a filled roadbed through the Manhattan Marsh; 2) the addition of the "Detwiler Dike" as part of the wetlands mitigation plan, and the wetlands mitigation plan itself; 3) the planned construction of the I-280 Maumee River Crossing; 4) the "unnoticed existence" of certain historic properties; 5) the failure to consider a limited-build alternative; and 6) once again, the exclusion of the CBD Connector and the Development Scheme.
 
 
 29
 The Supreme Court dealt extensively with supplemental environmental impact statements and the standards governing them in Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377. The Court initially observed that "[t]he subject of postdecision supplemental environmental impact statements is not expressly addressed in NEPA," but that regulations issued by the Council on Environmental Quality "impose a duty on all federal agencies to prepare supplements to either draft or final EIS's if there 'are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.' " Id. at 370, 372, 109 S.Ct. at 1857, 1858 (citations omitted). The Court wrote as follows with regard to the standard governing an agency's decision whether to perform a supplemental EIS:
 
 
 30
 [A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made. On the other hand, ... NEPA does require that agencies take a "hard look" at the environmental effects of their planned action, even after a proposal has received initial approval. Application of the "rule of reason" thus turns on the value of the new information to the still pending decisionmaking process. In this respect the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance: If there remains "major Federal actio[n]" to occur, and if the new information is sufficient to show that the remaining action will "affec[t] the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.
 
 
 31
 Id. at 373-74, 109 S.Ct. at 1859 (footnotes and citations omitted).
 
 
 32
 The Court further held that the agency's decision about the significance of any effect on the environment was "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." Id. at 376, 109 S.Ct. at 1860. The Court pointed out that in the case before it, the arguments for setting aside the decision not to issue a supplemental EIS were, essentially, that the "expert review of the new information was incomplete, inconclusive, or inaccurate." Id. at 376-77, 109 S.Ct. at 1861. As such,
 
 
 33
 [t]he dispute ... does not turn on the meaning of the term "significant" or on an application of this legal standard to settled facts. Rather, resolution of this dispute involves primarily issues of fact. Because analysis of the relevant documents "requires a high level of technical expertise," we must defer to "the informed discretion of the responsible federal agencies." ... Accordingly, as long as the [agency's] decision not to supplement ... was not "arbitrary or capricious," it should not be set aside.
 
 
 34
 Id. at 377, 109 S.Ct. at 1861 (footnote and citations omitted).
 
 
 35
 The Court then turned to an analysis of whether the decision was arbitrary or capricious:
 
 
 36
 [T]he reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." This inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one." When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.
 
 
 37
 Id. at 378, 109 S.Ct. at 1861 (citation omitted).
 
 
 38
 The plaintiffs have simply failed to present anything that would justify a conclusion by this court that the agency decision in question was arbitrary and capricious. The district court concluded as follows:
 
 
 39
 The Court has reviewed the administrative record in this case. The record contains several hundred pages of government documents addressing specifically the question of whether a supplemental EIS is necessary. The determination contains a detailed evaluation of all the claims raised by Plaintiffs in this lawsuit. The record indicates that Plaintiffs raised each of their claims with Defendants during the administrative process, that each claim was carefully considered, and that each claim was rejected on its merits. The record indicates that Defendants' evaluation was far from the cursory and arbitrary process Plaintiffs claim it to be. For each of Plaintiffs' claims, there are at least ten pages, and in most cases twenty to thirty pages, of detailed scientific study by neutral professionals and explanation of why Defendants made the substantive decisions they did. The record reveals a decisionmaking process that was not merely adequate, but exemplary. On such a record, the Court cannot find that Defendants' determination not to supplement the EIS to be arbitrary and capricious or a violation of law.
 
 
 40
 Sierra Club, 915 F.Supp. at 1395-96. Unlike the Marsh plaintiffs, the plaintiffs here have not even pointed to any conflicting expert views. We find it noteworthy that their assertions are not supported by any citations to the record, either with regard to the actuality of the adverse effects or with regard to the treatment in the reevaluation. They have, instead, simply set forth their unsupported views about the effect of various factors. While they contend that these effects were not "adequately" taken into account, they do not dispute that they were in fact considered and addressed by the defendants. In short, the plaintiffs believe that the defendants reached the wrong conclusion. That, it is plain, is not the type of argument that allows a court to conclude that an agency's decision was arbitrary and capricious.
 
 D.
 
 41
 The plaintiffs argued below that the Secretary of Transportation failed to determine whether there were feasible prudent alternatives before taking certain properties required for this Project that are known as so-called § 4(f) properties. Section 4(f) property is a "public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, ... or any land from an historic site of national, State, or local significance." 23 U.S.C. § 138. Part of the plaintiffs' claims in this regard related to the initial determination ratified in the 1984 ROD that there was no feasible and prudent alternative to taking the wetlands and other § 4(f) properties affected by the Project. The district court concluded that these claims were time-barred. See Sierra Club, 915 F.Supp. at 1396. The plaintiffs also argued, however, that in conducting the subsequent reevaluation, the defendants erroneously decided in 1995 that no new § 4(f) sites were involved. On appeal, the plaintiffs claim that dozens of § 4(f) properties were simply ignored in the reevaluation process, contrary to the district court's finding.
 
 
 42
 Once again, our treatment of this argument is determined by our earlier conclusion regarding the applicable statute of limitations. There has been no change to the plan for the Parkway since the time of the initial EIS. Thus, nothing new occurred affecting § 4(f) properties in the period between the 1984 EIS and the 1995 reevaluation. The plaintiffs' arguments, therefore--even though ostensibly predicated on flaws in the reevaluation--are simply an attempt at a second bite at the apple.
 
 
 43
 Equally important, however, is the fact that the plaintiffs have simply given this court nothing to work with in evaluating their claimed error. Federal statutes provide as follows with respect to so-called § 4(f) properties:
 
 
 44
 (a) It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.
 
 
 45
 ....
 
 
 46
 (c) The Secretary may approve a transportation program or project ... requiring the use of publicly owned land of a public park, recreation area, or wildlife or waterfowl refuse of national, State, or local significance, or land of an historic site of national, State, or local significance ... only if--
 
 
 47
 (1) there is no prudent and feasible alternative to using that land; and
 
 
 48
 (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.
 
 
 49
 49 U.S.C. § 303; see also 23 U.S.C. § 138. This court has held that in reviewing § 4(f) decisions, a court should affirm a decision if it concludes " 'that the Secretary could have reasonably believed that in [the] case there are no feasible alternatives or that alternatives do involve unique problems.' " Communities, Inc., 956 F.2d at 624 (citation omitted). It is, further, the responsibility of the plaintiffs to propose cognizable alternatives that would not use § 4(f) resources. See id. at 625.
 
 
 50
 The plaintiffs' one-page argument contains no citations to the record purporting to illustrate the alleged adverse effect on the properties, nor does it demonstrate the alleged failure to evaluate. The district court concluded that all of the plaintiffs' arguments were considered and fully addressed by the agency--and, once again, our review of the agency's action is limited to a determination whether the agency acted arbitrarily, capriciously, or otherwise not in accordance with the law. See id. at 623. The plaintiffs, however, do not contest the defendants' assertion that the properties that concern the plaintiffs are simply not affected by the Project. Indeed, the plaintiffs never even bother to specify which sites they believe are § 4(f) properties, apparently anticipating that this court will comb through the plaintiffs' lower court arguments and constructively apply them on appeal. In short, once again, the plaintiffs have fallen far short of demonstrating that the defendants' decisions were arbitrary and capricious.
 
 E.
 
 51
 As alluded to previously, the Army Corps of Engineers determined at an early planning stage that a special wetlands permit was not required for the Project, but later changed its position following a change in the legal definition of wetlands. The City then applied for a special § 404 permit, pursuant to 33 U.S.C. § 1344(a), which was approved in 1992. On appeal, the plaintiffs renew five objections, raised below, to the adequacy of the § 404 application and approval process.1.
 
 
 52
 The plaintiffs' first contention is that the Corps should have prepared an EIS in connection with the § 404 permit process, and that the district court erroneously concluded that the Environmental Assessment/Finding of No Significant Impact, or EA/FONSI, prepared by the Corps complied with § 404. The plaintiffs assert that the EA/FONSI in fact "listed a litany of adverse effects" that would result from the Project.
 
 
 53
 The necessity for preparing an EIS is a decision that is the responsibility of the agency in question. See Park County, 817 F.2d at 621. The applicable regulations require that, "[i]n determining whether to prepare an environmental impact statement[,] the Federal agency shall ... prepare an environmental assessment." 40 C.F.R. § 1501.4(b)-(c); see Sierra Club, 857 F.2d at 1312. Thus, agencies first prepare an "environmental assessment" (EA) in order to determine whether the project's effect on the environment will be significant enough to warrant a more detailed "environmental impact statement." 40 C.F.R. § 1501.4(b)-(c). If the agency decides that an environmental impact statement is unnecessary, then it prepares a "finding of no significant impact," or FONSI. 40 C.F.R. § 1501.4(e). " 'An EA allows the agency to consider environmental concerns, while reserving agency resources to prepare full EIS's for appropriate cases. If a finding of no significant impact is made after analyzing the EA, then preparation of an EIS is unnecessary.' " Park County, 817 F.2d at 621 (quoting Sierra Club v. United States Dep't of Transp., 753 F.2d 120, 126 (D.C.Cir.1985)). This court will overturn an agency decision not to issue an environmental impact statement only if it is found to be arbitrary, capricious, or an abuse of discretion. See Crounse Corp. v. ICC, 781 F.2d 1176, 1193 (6th Cir.1986).
 
 
 54
 The district court rejected the plaintiffs' § 404 argument, as follows:
 
 
 55
 [T]he Court in this case ... faces a situation in which the administrative record reveals that the federal agency conducted a detailed survey of the potentially affected areas, considered the impact of the planned project, and determined that there would be no significant adverse effects on the environment. Plaintiffs misrepresent the Statement of Findings produced by the Corps to the extent that they claim it contains several findings of "substantial adverse impacts." When read in context, the phrases quoted by Plaintiffs ... prove to refer to either (a) temporary impacts during the construction phase of the Project only, or (b) effects that would occur in the absence of mitigation efforts. Every reference to adverse impacts concludes with the determination that there are no substantial long-term detrimental impacts from the Project.
 
 
 56
 Sierra Club, 915 F.Supp. at 1398-99.
 
 
 57
 On appeal, the plaintiffs have wholly failed to acknowledge the observations of the district court that the Corps conducted a detailed survey, considered the impact of the Project, and determined that there would be no significant adverse effects. Their claim that the Corps in fact found multiple adverse effects likewise ignores the district court's observation that the language they point to is taken out of context, and refers either to temporary effects only, or to effects that would occur in the absence of a mitigation plan. In sum, the plaintiffs have failed to demonstrate arbitrary or capricious action on the part of the agency.
 
 2.
 
 58
 The plaintiffs next contend that the Corps improperly failed to give the Advisory Council on Historic Preservation, or the ACHP, an opportunity to review and comment on its conclusion of "no adverse effect" on historic properties. In response, the defendants point out that the district court found that the FHWA submitted its own "no adverse impact" findings to the ACHP, and that those findings were identical to the findings of the Corps. Although the plaintiffs grudgingly concede that the findings of the two entities "may have been similar," they maintain, without elaboration, that the FHWA's record "was not at all similar to the record that would have been submitted by the Corps" if the Corps had complied with its obligation to compile and submit a record.
 
 The NHPA requires that
 
 59
 [t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking ... take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register ... [and] afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking.
 
 
 60
 16 U.S.C. § 470f. The regulations of the Corps provide that "[i]n processing a permit application, the district engineer will generally accept ... the Federal agency's or Federal lead agency's compliance with the requirements of the NHPA." 33 C.F.R. pt. 325, app. C2(c).
 
 
 61
 The plaintiffs do not dispute that the ACHP was fully apprised of the FHWA findings regarding historic properties; that the FHWA findings were identical to those of the Corps; and that the ACHP concurred in the no-adverse-effect finding. The regulations of the Corps make clear, as the defendants argue, that it is entitled to rely on the lead agency--here, the FHWA--in complying with the NHPA requirements. In short, we conclude, the plaintiffs simply fail to articulate any recognizable error here.
 
 3.
 
 62
 The plaintiffs next contend that the § 404 permit was invalid because the Corps did not previously prepare a final, detailed mitigation implementation plan, as opposed to mitigation goals. They appear to contend that the goals formulated here were too vague and general to suffice.
 
 
 63
 As both the defendants and the district court have observed, however, numerous cases have held that it is not necessary to have a final, detailed mitigation plan prior to approval of a § 404 permit; instead, a permit conditioned on future implementation of a mitigation plan complies with the dictates of the Clean Water Act. See Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Eng'rs, 87 F.3d 1242, 1248 (11th Cir.1996); National Wildlife Fed'n v. Whistler, 27 F.3d 1341, 1343, 1346 (8th Cir.1994); Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1528-29 (10th Cir.1992); Friends of the Earth v. Hintz, 800 F.2d 822, 825-26, 836-37 (9th Cir.1986). And the plaintiffs are simply incorrect when they assert that the § 404 permit was predicated merely on vague mitigation goals rather than on a sufficiently detailed plan; the mitigation plan relied on by the Corps here, was, in fact, quite specific. Again, therefore, we reject the plaintiffs' argument.
 
 4.
 
 64
 Next, the plaintiffs contend that the Corps failed to adequately consider alternatives to the Project. In particular, they assert, the Corps should not have rejected an alternative proposed by the plaintiffs that involved improvements to Summit Street.
 
 
 65
 Applicable regulations provide that the Corps may not issue a § 404 permit if "there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). The definition of "practicable" allows the taking into consideration of "overall project purposes." Id. at § 230.10(a)(2)
 
 
 66
 The district court rejected the plaintiffs' argument on this score, writing as follows:
 
 
 67
 Plaintiffs' next objection is that ODOT failed to show that no practical alternatives to the proposed roadway existed. This objection lacks merit. While Plaintiffs may disagree with Defendants' substantive determination that there were no practical alternatives to the proposed roadway, the administrative record indicates that several alternatives were proposed, weighed, and rejected on the merits. The administrative record on this one issue is lengthy, detailed, and exhibits a careful evaluation on the part of Defendants. The Court cannot hold ODOT's determination that no practical alternatives to the proposed roadway existed to be arbitrary.
 
 
 68
 Sierra Club, 915 F.Supp. at 1398. We conclude that the plaintiffs' argument is, once again, flawed due to their failure to refute, or even address, the district court's observation that the Summit Street alternative, along with others, was proposed, weighed, and rejected on the ground that it was impracticable given the Project's overall purpose. This type of rejection is not arbitrary and capricious.
 
 5.
 
 69
 Finally, the plaintiffs contend that the § 404 public notice failed to mention a required Ohio EPA water quality certification, and that this failure was fatal to the permit. They offer basically no explanation of their position. The defendants contend that the failure to include a citation to water quality certification was harmless error because the Ohio EPA had been aware since 1989 that its certification would be requested. Because the notice requirement was functionally satisfied, there is no basis for reversal.
 
 
 70
 The plaintiffs are correct that regulations require that the Corps refer, in its public notice, to a requirement that the Project receive water quality certification from the relevant state agency. See 33 C.F.R. § 325.3(a)(8). The purpose of the certification is to notify the state agency--here, Ohio EPA--of the need for its certification. In addressing and rejecting the plaintiffs' argument below, however, the district court noted the absence of any prejudice resulting from the apparent failure here:
 
 
 71
 [T]he Corps failed to refer in their public notice to the requirement that the Project receive water quality certification from OEPA, such reference being required by 33 C.F.R. § 325.3(a)(8). The Defendants concede that the required reference was omitted from the notice, but argue that the error was harmless, since OEPA in fact received notice that its certification would be requested.... [Thus, t]his notice requirement to OEPA was functionally satisfied. Plaintiffs have suggested no credible reason why omission of the reference to OEPA would affect the public's review of the proposal, or in any way change the comments made by them to the Corps. Therefore, the Court finds this omission to be harmless error.
 
 
 72
 Sierra Club, 915 F.Supp. at 1397-98.
 
 
 73
 As the district court correctly recognized, this court applies a harmless-error rule to APA cases, such that a mistake that has no bearing on the ultimate decision or causes no prejudice shall not be the basis for reversing an agency's determination. See Blackman v. Busey, 938 F.2d 659, 664 (6th Cir.1991). We find the plaintiffs' argument to be, at best, nitpicking. There is no question that the Ohio EPA was aware of the need for certification, and that it in fact waived the certification requirement. The plaintiffs fail to show any prejudice resulting from the technical failure to comply with the regulation.
 
 F.
 
 74
 Finally, the plaintiffs advance three arguments concerning the district court's disposition of various discovery and procedural disputes. These remaining arguments may be dealt with in summary fashion.
 
 1.
 
 75
 The plaintiffs deposed Bernard Leite, the Director of Public Service for Toledo, on September 18, 1995. Approximately ten days later, the plaintiffs filed a notice for the taking of additional deposition testimony from Leite; two weeks after that, they filed yet another notice to depose Leite, along with another individual. At this point, the defendants filed motions contending that the taking of depositions was inappropriate, on the ground that judicial review should be limited to the administrative record. The district court then issued a ruling allowing depositions only by leave of court. On appeal, the plaintiffs contend, with virtually no explanation, that the court "acted prejudicially and unlawfully" in not allowing the Leite deposition to proceed, given that it had already begun.
 
 
 76
 This court reviews a district court's decision with respect to discovery matters using an abuse of discretion standard. See Theunissen v. Matthews, 935 F.2d 1454, 1465 (6th Cir.1991). While this court has held that " 'summary judgment should not ordinarily be granted before discovery has been completed.' " Smith v. Freland, 954 F.2d 343, 348 (6th Cir.1992) (citation omitted), a plaintiff complaining that a district court granted summary judgment without allowing adequate discovery must, at a minimum, be able to show that he could obtain information through discovery that would disclose material facts, see Chilingirian v. Boris, 882 F.2d 200, 203 (6th Cir.1989). Here, the plaintiffs have failed to make the slightest effort to explain what information they hoped to be able to uncover during the Leite deposition, or how the deposition would have aided their opposition to summary judgment. Without this type of explanation, we are simply unable to conclude that the district court's limitations on the discovery process constituted an abuse of discretion.
 
 2.
 
 77
 The plaintiffs filed a motion below requesting that the district court supplement the administrative record with other records related to the Project. In ruling on the motion, the district court noted that the plaintiffs "ha[d] provided a proffer of exhibits containing most of the items Plaintiffs seek to have admitted." Sierra Club, 915 F.Supp. at 1387-88. The defendants objected to supplementation on the ground that "the items proffered by Plaintiffs are not properly part of the record, and are irrelevant to the Court's review of the agencies' determinations," and that supplementation "w[ould] serve only to delay resolution of the case." Id. at 1388. The district court nonetheless granted the plaintiffs' motion in part, limiting supplementation to the items that had already been proffered:
 
 
 78
 The Court finds that the equities in this case favor granting Plaintiffs' motion to supplement the record as to the items contained in Plaintiffs' proffer, and denying Plaintiffs' motion to supplement as to all other items. The items already submitted on the record cause no harm and may be helpful to the Court. Defendants will incur no additional cost or delay, because the items have already been provided by Plaintiffs. Because the case is being tried to the Court, the Defendants need not worry that a jury will misuse the evidence....
 
 
 79
 The equities balance differently as to all other items requested by Plaintiffs. An order to supplement with any items not yet in the record could cause cost and delay to Defendants. Plaintiffs have not made a sufficient showing of "bad faith or improper behavior" as to justify such an affirmative order. Supplementation with those items will not be ordered.
 
 
 80
 Id. (citation omitted).
 
 
 81
 The plaintiffs now assert that "[s]pace prohibits detailing the supplementations sought," but contend that "[a] reviewing court may consider evidence outside the record." With no further argument, and no attempt to address the district court's reasoning, they conclude that, therefore, supplementation was wrongly denied.
 
 
 82
 The APA requires courts to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. As a general matter, "courts confine their review to the 'administrative record,' " which "includes all materials 'compiled' by the agency[ ] that were 'before the agency at the time the decision was made.' " James Madison Ltd. by Hecht v. Ludwig, 82 F.3d 1085, 1095 (D.C.Cir.1996) (citations omitted), cert. denied, --- U.S. ----, 117 S.Ct. 737, 136 L.Ed.2d 676 (1997). Several reasons justify supplementation of the administrative record, such as when an agency deliberately or negligently excludes certain documents, or when the court needs certain " 'background information' in order to determine whether the agency considered all of the relevant factors." Id. (citation omitted); see United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409, 1428 (6th Cir.1991). Courts have suggested that in order to justify supplementation, a plaintiff must make a " 'strong showing' of bad faith." James Madison, 82 F.3d at 1095.
 
 
 83
 While this court has not addressed the issue, other courts have held that "a district court's refusal to supplement the administrative record" is akin to "a district court's denial of discovery." Id. The decision is, accordingly, reviewed on appeal for an abuse of discretion. See id. Here, the plaintiffs have failed to point to a single factor that would suggest the administrative record was inadequate for an assessment of their claims. They have not, therefore, demonstrated that the district court's decision was an abuse of discretion.
 
 3.
 
 84
 After concluding its exhaustive analysis leading to a grant of summary judgment on behalf of the defendants, the district court noted that "[a]ll other currently pending motions," which included the plaintiffs' motion for summary judgment, would be "denied as moot." Sierra Club, 915 F.Supp. at 1399. We are now left with the plaintiffs' final argument, that their motion for summary judgment was not moot. As best as we can understand, the plaintiffs contend that because they sought summary judgment based on information developed during the course of this litigation and because the motion was "timely filed," therefore, the district court should have addressed the motion on the merits. It is quite evident, however, that the district court could not have granted summary judgment both to the defendants and to the plaintiffs. Since it concluded that the defendants were entitled to summary judgment, therefore, the plaintiffs' motion for summary judgment no longer presented a justiciable controversy. In other words, it was moot.
 
 III.
 
 85
 For the foregoing reasons, the district court's judgment is AFFIRMED.