**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 15a0109n.06

Case No. 13-2704

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Feb 06, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JAMES WALLACE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| WAYNE COUNTY; ROBERT A. FICANO; | ) | MICHIGAN |
| NADER FAKHOURI;VALERIE DENHA; | ) | |
| TOM DOWNEY; LYNN INGRAM, all | ) | |
| individuals sued in their official and personal | ) | |
| capacity, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: BOGGS and COOK, Circuit Judges; QUIST, District Judge[*]

COOK, Circuit Judge. James Wallace, a former employee of Wayne County, Michigan, appointed by County Executive Robert Ficano, alleges that Ficano and his aides fired him because he refused to engage in political activities during working hours. He sued the County, Ficano, and Ficano appointees Nader Fakhouri, Valerie Denha, Lynn Ingram, and Tom Downey, alleging violations of 42 U.S.C. § 1983 and the Michigan Whistleblower's Protection Act, Mich. Comp. Laws §§ 15.361–15.369. The district court granted summary judgment in favor of the defendants, and Wallace appeals. Because he fails to link his termination to protected activity

---

[*]The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

and to demonstrate that the district court prejudiced his case by limiting him to a three-hour deposition of Ficano, we affirm.

I.

Between 2003 and January 2012, Wallace worked full-time as one of Ficano's salaried "appointees." His job duties as a graphic designer included photographing County events attended by Ficano and designing brochures and magazine advertisements to publicize County programs and services. In addition to those duties, Wallace alleges that, as a Ficano appointee, he was

> directed to actively "volunteer" as a condition of his employment [] for the re-elect Ficano campaign[,] . . . forced to spend days walking door-to-door handing out campaign literature, stuffing mailers, working the polls during election cycles, walking in parades, and working at phone banks. He was also required to purchase tickets to Ficano political events.

(R. 1-4, Am. Compl. ¶ 24.) He also contends that his immediate supervisor and other high-level appointees pressured him to design campaign materials during County working hours, and that defendants fired him because he refused to do so.

In late 2009 or early 2010, Wallace moved from the County's Economic Development Department to its newly-formed Communications team. Tom Downey, the County's Director of Marketing, supervised Wallace and reported to Director of Communications Lynn Ingram.

Wallace had only "limited" contact with Ficano during his tenure with the County, and he did not work with defendants Valerie Denha (a County Project Manager) and Nader Fakhouri (an Assistant County Executive) on any County projects. But Wallace occasionally accepted directions from Fakhouri and Denha to design materials for three Ficano-affiliated organizations: the Robert A. Ficano Hope Foundation ("Hope Foundation"), a 501(c)(3) non-profit organization that provided scholarships to local students and supported local charities; Ficano's re-election

- 2 -

committee ("Ficano Committee"); and Ficano's political action committee ("Ficano PAC"). Between 2007 and 2010, he earned at least $7,000 on such projects in addition to his County salary.

A. *County Policies Concerning Political Activities*

At all times during Wallace's appointment, the Ficano administration prohibited political activity by appointees during working hours, and informed appointees that they were not required to participate in campaign or other political activities as a condition of their employment. Wallace signed forms stating that he agreed to report any suspected violations of those policies to the County's Inspector General. He maintains that the forms were a "joke" and that he signed them because he feared that he would face retaliation if he did not. He heard that the administration fired two appointees for reporting violations but admits that he did not speak directly with either person.

B. *Pressure from Superiors to Engage in Political Activity*

Notwithstanding those official policies, Wallace maintains that Ficano and his deputies expected appointees to support Ficano's political career both on and off the job. He claims that defendants fired him because he resisted pressure to work on both overtly political projects *and* "nonprofit" or "charity" projects that Wallace believed were political.

1. *Political Projects*

Wallace contends that Fakhouri, Denha, and Downey pressured him to work on Ficano's campaign materials and other overtly political assignments during County hours, and became angry when he refused. Wallace particularly alleges that Downey expected him to revise materials for Ficano's 2010 election campaign during the work day, but that Wallace told Downey that he felt more comfortable completing such projects on his own time, given the rules

governing appointees' political activities. According to Wallace, Downey responded, "This is a safe environment here, you can do it here," and, "Really? Do you have to go home to do that?" (R. 146-4, Wallace Dep. at 31.) And during his deposition, Wallace referred generally to "arguments" with Fakhouri and Denha concerning whether he could design materials for the Ficano Committee and Ficano PAC during County hours, but provided no specific examples.

Wallace and Downey also disagreed about the propriety of including "Paid by the Ficano PAC" disclaimers on political advertisements they designed during County hours. Downey allegedly asked Wallace to include a "Paid by the Ficano PAC" disclaimer on an advertisement that urged the state to cede control of Wayne County's budget to the County Executive. Wallace refused on the grounds that County taxpayers paid their salaries and that they had completed the advertisement during County time.

Wallace maintains that, on a different occasion, Downey directed him to include Ficano's campaign logo on a County-funded advertisement for the Grosse Pointe Little League. Wallace refused.

### 2. *Nonprofit Projects*

Wallace and Downey also disagreed about whether designing advertisements for nonprofit organizations, including Ficano's Hope Foundation, violated the County's policy prohibiting appointees from engaging in political activities during County work hours. During Wallace's tenure, the Communications team spent about a quarter of their time creating advertisements to support organizations that Ficano believed to "advance the interests of the County" and its residents, including Ficano's own Hope Foundation. The advertisements invariably included Ficano's name or image. Wallace objected to working on such assignments during County hours because he believed they were "political."

Downey or Ingram relayed Wallace's concerns to Ficano's Chief of Staff, Matthew Schenk, in early 2011. Schenk recalls learning that "there was work that they had given to [Wallace] to perform that he was refusing to do because he thought it was political. And they thought it was related to nonprofit activity, so that it was not political." (R. 146-3, Schenk Dep. at 42.) Schenk asked Tim Taylor, the County's Director of Personnel, to "find out what was going on." (*Id.*)

In early 2011, Taylor, Wallace, Downey, and Ingram discussed Wallace's concerns about whether nonprofit advertisements were "political." Wallace secretly recorded the meeting. Downey began the meeting by advising Wallace that:

> I've enlisted an expert to talk about, we had this conversation the other day about . . . what's appropriate to be doing on County time. And what's not appropriate on County time. You've raised a good question and I've kind of rooted around a little bit, so I've got an answer for us on that when we get requested to do work on charity stuff. But, I also want to talk a little more broadly about how we're structured right now . . . and how we need you to operate. Now you should know, clearly, you're a valued member of the team, you're not going anywhere unless you want to go somewhere, and I think you're really creative, a great asset and I'd like you to stay on the team regardless. But as far as charity work goes, we are within the law and perfectly able to do that kind of work when Mr. Ficano is acting as Wayne County Executive. Even if the contributions [are] coming from [the Hope Foundation], we can do that on County time.

(R. 156-2, Meeting Tr. at 1.) Taylor admitted that there was a "gray area" and "some subjectivity involved" in drawing a line between political and non-political work, and acknowledged that the County "probably" wouldn't use tax dollars to pay an appointee "to do 100% charity work." (*Id.* at 4–6.) He explained, however, that appointees were expected to "do charity stuff" as part of their jobs. (*Id.* at 6.)

Schenk maintains that Taylor told him after the meeting that "there was a conversation and some resolution to the issue." (R. 146-3, Schenk Dep. at 42.) But Schenk never spoke with

Wallace directly about his concerns, which he understood to involve "what activity was political and what activity was for nonprofits or things [that] were allowed." (*Id.* at 46.)

*C. Alleged Harassment & Termination*

Wallace alleges that his already strained relationship with Downey deteriorated following their meeting with Taylor. He contends that Downey began to exclude him from Communications team meetings, assign him menial tasks that he had not been asked to do previously, and withhold information about upcoming project deadlines. And Wallace felt that Downey tried to intimidate him by displaying a book titled "The No Asshole Rule" next to Wallace's desk. Wallace spoke with Ingram, but nothing changed.

In April 2011, the Ficano administration terminated the positions of several appointees, including a member of the Communications team. The Ficano aide in charge of that round of cuts identified Wallace as a possible candidate for discharge, but Wallace kept his job.

In late 2011, Ficano announced to the media that the County would eliminate additional positions. Soon afterward, he asked Schenk to "take a look at reducing the number of at-will employees." (R. 146-3, Schenk Dep. at 144.) Schenk initially selected approximately thirty candidates for termination. He testified that his criteria at that stage included (1) whether he had heard complaints about an employee, (2) whether he thought the employee "was less significant to the operations," (3) whether he knew the person's name and what they did for the County, and (4) whether he "had concerns about them as employees, personally." (*Id.* at 147.)

Next, Schenk spoke with several department heads, including Ingram, about the employees on his initial list. According to Schenk, Ingram said he did not want to lose anyone from his team, but acknowledged that the press secretary or a college intern could photograph County events. Schenk eliminated several employees from the list following his conversations

with the department heads. He then met with Ficano, Ingram, Fakhouri, and another aide to discuss the remaining eighteen to twenty-five names on the list. The meeting attendees did not add new employees to the list, but Schenk testified that they may have decided during the meeting to eliminate some names from consideration. He recalls that Ingram was called away before they discussed Wallace.

After meeting with Ficano, Ingram, Fakhouri, and the other aide, Schenk spoke with several department heads about employees who remained under consideration. Ultimately, he submitted a final list of eleven employees, including Wallace, for Ficano's approval. Ficano approved the final list, but he denies knowing why Schenk selected Wallace. Denha and Downey aver that Schenk did not consult them about the January 2012 terminations.

According to Schenk, he selected Wallace and another Communications employee for termination because "the size of our Communications team was a concern in terms of the public appearance." (R. 146-3, Schenk Dep. at 167–68.) He decided to let Wallace go because

> [a] lot of the interactions that I had with James over the years were on projects of graphic design. . . . We knew that that work was not going to be there. And the other major component of what James did that I was aware of was taking pictures at various events with the CEO or in support of the other activities. And we felt that if we needed that service, we could do it on a more as-needed basis with a student . . . or something like that so that it didn't require a full-time position. Also, Tom Downey had some graphic design experience, and so that he could pick up some of that.

(*Id.* at 172–73.)

The County terminated Wallace's employment in January 2012.

## D. Procedural History

Wallace filed suit in Wayne County Circuit Court. Defendants removed the case to federal court after Wallace amended his complaint to include a First Amendment retaliation

claim. Following discovery—during which time the district court limited Wallace's deposition of Ficano to three hours over Wallace's objections—the defendants requested qualified immunity and moved for summary judgment.

The district court declined to address the qualified-immunity argument, proceeded to the merits, and granted summary judgment for the defendants on the grounds that Wallace could not link his termination to any conduct protected by the First Amendment or the Michigan Whistleblower's Protection Act. The court explained that "Schenk's unchallenged testimony establishes that he alone selected plaintiff . . . for termination, and that his reasons for selecting plaintiff had nothing to do with his refusals or complaints regarding political work." (R. 166, Op. & Order.)

Wallace timely appeals.

## II.

On appeal, Wallace argues that he put forward sufficient evidence to raise a genuine issue that defendants fired him because he objected to politically charged assignments, and that therefore the district court erred in granting summary judgment to the defendants on his First Amendment retaliation and Michigan Whistleblower's Protection Act claims. He also maintains that the district court imposed unreasonable time limits on his deposition of Ficano, thus prejudicing his ability to prove his case.

*A. Summary Judgment Rulings*

We review de novo the district court's grant of summary judgment on Wallace's First Amendment and whistleblower claims, affirming if the evidence, viewed in the light most favorable to Wallace, demonstrates that no genuine issue exists as to any material fact and that

the defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Vill. of Oakwood v. State Bank & Trust Co.*, 539 F.3d 373, 377 (6th Cir. 2008).

### 1. First Amendment Retaliation

To prevail on his First Amendment claim, Wallace must establish the three elements of a prima facie case of retaliation: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) . . . the adverse action was motivated at least in part by his protected conduct." *Dixon v. Univ. of Toledo*, 702 F.3d 269, 274 (6th Cir. 2012). If he establishes those elements, the burden shifts to defendants—here, the five individual defendants sued in their personal capacities—to demonstrate, by a preponderance of the evidence, that they would have discharged Wallace "absent the protected conduct." *Dye v. Office of Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (quoting *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010)). Defendants are entitled to summary judgment if a reasonable jury, viewing the evidence in the light most favorable to Wallace, could only return a verdict in their favor. *Id.* at 294–95 (citing *Eckerman*, 636 F.3d at 208).

The district court held that Wallace failed to establish the "causation" element of his prima facie case because he could not link his political affiliation or speech to Schenk's decision to terminate him and several other employees. On appeal, Wallace contends that the evidence, viewed in the light most favorable to him, shows that Schenk did not act alone. But he does not rebut Downey's and Denha's statements that Schenk never consulted them about the terminations. Further, no jury could reasonably infer causation from the evidence of Ficano's, Fakhouri's, and Ingram's limited involvement. As an initial matter, Wallace does not dispute that Schenk independently identified around thirty employees as possible candidates for

separation. Ficano's, Fakhouri's, and Ingram's failure to intervene to *remove* Wallace from the list does not, without more, support a reasonable inference that they retaliated against him because of his protected conduct. Moreover, Wallace has not shown that Ficano, Fakhouri, or Ingram had the necessary retaliatory motive. No evidence suggests that Ficano knew about Wallace's complaints or perceived that Wallace did not support him politically. Wallace's vague references to earlier "arguments" with Fakhouri during the 2010 campaign do not support an inference that Fakhouri retaliated against him in January 2012. *See Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400–01 (6th Cir. 2010) (cautioning that a plaintiff generally must supplement his claim with evidence of other retaliatory conduct rather than relying solely on temporal proximity when significant time has elapsed between his protected conduct and his termination). And while Ingram knew that Wallace objected to work he deemed political, nothing in the record suggests that Ingram was motivated to fire Wallace for those complaints. Notably, Wallace does not contend that Ingram lied to Schenk about whether other employees could photograph County events.

Wallace next suggests that he can prove causation under a "cat's paw" theory of liability by showing that Ingram and Downey intended to retaliate against him and actually influenced Schenk's decision to discharge him. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 (6th Cir. 2012) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 131 S. Ct. 1186, 1194 (2011)) (explaining that an employee may impute a supervisor's improper motives to his employer by showing that the supervisor intended to cause an adverse employment action and, in fact, proximately caused an unbiased decisionmaker to take the "ultimate employment action"); *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 677–78 (6th Cir. 2008). But Wallace forfeited any reliance on that theory by raising it for the first time in his motion to

reconsider the adverse summary judgment ruling, despite ample opportunity to raise it earlier. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008); *see also Horner v. Klein*, 497 F. App'x 484, 490 n.2 (6th Cir. 2012) (declining to address cat's-paw argument because it was raised for the first time on appeal). The district court declined to address Wallace's cat's-paw argument in denying the motion for reconsideration, and therefore the issue is not properly before this court. *Cf. Lexicon, Inc. v. Safeco Ins. Co. of Am., Inc.*, 436 F.3d 662, 670 n.6 (6th Cir. 2006) (declining to find argument forfeited, in part on grounds that the district court fully addressed the argument in its order denying a motion to alter, amend, or vacate the judgment). Moreover, several factors—including the fact-intensive nature of Wallace's cat's-paw argument—weigh against discretionary review of the issue. *See Scottsdale*, 513 F.3d at 552 (citing *Friendly Farms v. Reliance Ins. Co.*, 79 F.3d 541, 545 (6th Cir. 1996)) (outlining discretionary factors).

Finally, Wallace argues that the district court erred in finding that Schenk discharged him and eleven others for "budgetary reasons." That argument finds support in the record, because Schenk admitted during his deposition that the January 2012 layoffs were motivated more by the perception that Ficano's administration was over-staffed than by immediate budgetary concerns. He testified, for instance, that:

> [t]here were a lot of stories about the number of employees, the number of appointees, and so the discussion then was about reducing the number of at-will employees. We knew that the budget issues were going to be coming and we were going to have to make major decisions later to address the budget issues. This was more of a reduction in at-will staff.

(R. 146-3, Schenk Dep. at 142.) Still, no jury could reasonably infer from such testimony that the defendants fired Wallace because he objected to political projects, rather than for reasons of

public perception of County government. Importantly, Wallace presents no evidence that improper reasons motivated defendants to terminate the other appointees in January 2012.

### 2. *Michigan Whistleblower's Protection Act*

Wallace also appeals the district court's grant of summary judgment to the County and the individual defendants on his claim under the Michigan Whistleblower's Protection Act (WPA), Mich. Comp. Laws §§ 15.361–15.369. To establish a prima facie case under the WPA, Wallace must (1) show that he engaged in activity protected by the WPA, i.e., he reported or was about to report an actual or suspected violation of a law, regulation, or rule, and (2) connect his discharge—the only adverse action at issue in this case—to that protected activity. *See* Mich. Comp. Laws § 15.362; *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 471–72 (Mich. 2003). The district court found that Wallace could not link his discharge to any protected activity, because the "evidence conclusively shows that the discharge decision was made by a non-defendant, Schenk, with little or no involvement of defendants and that his reasons for doing so had nothing to do with plaintiff objecting to being required to perform political work." (R. 166, Op.& Order at 13.) The court held that the conversation between Schenk and Ingram or Downey in early 2011 was too remote from Wallace's discharge to permit an inference of causation.

Wallace argues that the district court erred because: (1) a jury could reasonably infer that Ficano, Fakhouri, and Ingram influenced Schenk's decision from their presence at the meeting to discuss candidates for termination, (2) he can prove causation under a cat's-paw theory because Schenk relied on information provided by Downey and Ingram, who "wanted adverse action taken against Wallace *because of* his reporting of the improper political activity that he was being forced to participate in," and (3) a jury could reasonably infer from Schenk's inability to recall details about his conversation with Downey and Ingram that Schenk knew that Wallace

complained about both nonprofit projects *and* overtly political assignments. None of these arguments has merit.

Wallace's first argument—that Schenk did not act alone—mirrors his argument in support of his First Amendment claim. We reject it for the same reason we found his earlier argument wanting: lack of evidence that Ficano, Fakhouri, or Ingram declined to persuade Schenk to remove Wallace from the list *because* he complained about politically-charged assignments. Further, Wallace puts forward no evidence that Ficano or Fakhouri even knew that he complained about illegal activity.

His second argument—that Downey and Ingram sought to discipline him for refusing to work on overtly political projects, and that Schenk included him on the list, at least in part, because Downey or Ingram reported that he refused to complete work assignments—fares no better. Again, Wallace forfeited reliance on a cat's-paw theory by failing to argue it at summary judgment. *See Scottsdale*, 513 F.3d at 553.

Finally, no jury could reasonably infer that Schenk knew Wallace reported feeling pressured to complete overtly political assignments for Ficano's campaigns during County time. Wallace suggests that Schenk's testimony about his conversation with Downey or Ingram in early 2011 is "brimming with inconsistencies," and that a jury could reasonably reject Schenk's account of the conversation entirely, concluding instead that Downey or Ingram told Schenk *everything* Wallace ever complained about. Not so. The purported inconsistencies—which boil down to Schenk's ability to recall the substance but not specific details of the conversation—do not undermine his credibility and so did not require the court to reject his account when considering the motion for summary judgment. *Cf. Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013) ("[S]ummary judgment is not appropriate where the opposing party offers

specific facts that call into question the credibility of the movant's witnesses." (quoting *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004))).

Ultimately, the record, viewed in the light most favorable to Wallace, shows that Downey or Ingram told Schenk in early 2011 that Wallace objected to creating advertisements that explicitly supported local nonprofit organizations while implicitly supporting Ficano's political career, Schenk asked Director of Human Resources Tim Taylor to investigate, Taylor reported back that the issue had been resolved, and Schenk selected Wallace and eleven other employees for discharge in January 2012. No jury could reasonably infer from such evidence that Wallace's concerns about politically tinged nonprofit work motivated Schenk to include him on his list of candidates for discharge some ten months later. *See West*, 665 N.W.2d at 472 ("To prevail [on his WPA claim], plaintiff had to show that his employer took adverse employment action *because of* plaintiff's protected activity, but plaintiff has merely shown that his employer disciplined him *after* the protected activity occurred.").

B. *Time Limits on Ficano's Deposition*

Finally, Wallace contends that the district court substantially prejudiced his case by limiting him to a three-hour deposition of Ficano rather than the standard seven hours contemplated by Federal Rule of Civil Procedure 30(b)(1). We review discovery rulings for abuse of discretion, *see Doe v. Lexington-Fayette Urban Cnty. Gov't*, 407 F.3d 755, 765 (6th Cir. 2005), and find none here. Wallace fails to show that he suffered any prejudice, much less substantial prejudice, as he identifies not a single question that he would have asked Ficano if given more time. *See Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997) (finding no abuse of discretion where party "failed to make the slightest effort to explain . . . how [an additional] deposition would have aided their opposition to summary judgment"); *cf. Cetlinksi v. Brown*, 91

F. App'x 384, 391 (6th Cir. 2004) (affirming evidentiary ruling where party relied on "bald assertions of 'harm' and 'prejudice'").

III.

For these reasons, we AFFIRM.