**COMMITTEE TO SAVE CLEVE-LAND'S HULETTS, et al.,**
**Plaintiffs,**

v.

**U.S. ARMY CORPS OF ENGINEERS,**
**et al., Defendants.**

No. 1:99–CV–3046.

United States District Court,
N.D. Ohio,
Eastern Division.

March 30, 2001.

Loren M. Gordon, Esq., Cleveland, OH, for Committee to Save Cleveland's Huletts, Edward J Hauser, James H. Korecko, Jerry C. Mann, Stephen L. Merkel, Rimantas Saikus, plaintiffs.

Richard J. French, Esq., Office Of The U.S. Attorney, Cleveland, OH, for United States Army Corps of Engineers, Joe N. Ballard, Lt. General, Chief of Engineers, Mark D. Feirstein, Colonel, District Engineer, Buffalo District, defendants.

### MEMORANDUM & ORDER

O'MALLEY, District Judge.

Plaintiffs, the Committee to Save Cleveland's Huletts, Edward J. Hauser, James H. Korecko, Jerry C. Mann, Stephen L. Merkel, and Rimantas Saikus (collectively the "Committee"), seek declaratory and injunctive relief against defendants, the U.S. Army Corps of Engineers, Chief of Engineers Lt. General Joe N. Ballard and District Engineer Mark D. Feirstein, (comprising "the Corps"). Plaintiffs ask this Court for many different categories of relief, some of which are difficult to decipher and others of which this Court has no authority to grant. It appears, however, that plaintiffs are primarily interested in (1) a declaration that the defendants acted improperly when they authorized the Cleveland–Cuyahoga Port Authority (the "Port Authority") to dredge an area of Lake Erie near Whiskey Island and (2) an order revoking or voiding that authority. The parties have filed cross-motions for summary judgment, each asserting they are entitled to judgment as a matter of law with respect to plaintiffs' claims.

For the reasons stated below, plaintiffs' motion for summary judgment is **GRANTED in part and DENIED in part.** (Docket no. 38). Defendants' motion for summary judgment is also GRANTED in part and DENIED in part. (Docket no. 40). The Court finds that plaintiffs' claim that the Port Authority "segmented" its application, pursuant to the National Historic Preservation Act (the "NHPA"), 16 U.S.C. § 470h–2(k), is not ripe, and thus grants summary judgment to the Corps on this claim and dismisses it. The Court further finds, however, that the Corps violated the NHPA by issuing a permit without awaiting comment from the Ohio State Historic Preservation Office (the "Ohio SHPO") or the Advisory Council on Historic Preservation (the "ACHP"). As explained below, a finding that the Corps issued the permit in violation of the NHPA entitles plaintiffs to all the relief the Court finds it is able to grant; the Court, accordingly, declines to reach the plaintiffs' remaining claims.[1]

The Court hereby Orders the Corps to revoke the Letter of Permission, permit no. 1999–01471(0), issued to the Port Authority on May 14, 1999.[2] If the Port

---

**1.** Plaintiffs' motion requesting permission to submit additional authority is also **GRANTED.** (Docket no. 50).

**2.** As explained below, the other relief plaintiffs seek is not reasonably related to the wrong committed by the Corps; the Court will not and cannot order defendants to supply that relief.

Authority requires any further dredging in the area covered by that permit, it must reapply for authority to do so. If a new application is made, defendants must comply with all requirements of the NHPA, including those mandating formal notice to the Ohio SHPO and ACHP and contemplating a waiting period after such notice prior to the issuance of a permit. The Corps must also consider whether the scope of any new permit sought implicates 16 U.S.C. § 470h–2(k). The Corps may then determine whether and under what conditions to reissue the permit. The Court also orders the Corps to pay plaintiffs' reasonable attorney's fees and costs.[3]

## I. Background

The Hulett Iron Ore Unloaders ["Huletts"] at issue in this suit were enormous ore unloading machines, about ten stories tall, that stood near where the Cuyahoga River flows into Lake Erie on the Pennsylvania Railway Ore Dock [the "Ore Dock"], located on Whiskey Island. George Hulett invented these imposing machines in the late 1800's. At one time, seventy-five Huletts unloaded ore from boats in the Great Lakes. Virtually all of the Huletts have now been dismantled or destroyed and none are currently in operation.[4] The four Huletts located on Cleveland's waterfront operated continuously from 1912 to 1992. After 1992, the Huletts were rendered obsolete by more modern methods of unloading bulk cargo from Lake Erie vessels. In 1993, the Huletts were designated a Cleveland Historic Landmark. In 1997, the Ore Dock was listed in the National Register of Historic Places; the primary historic aspect of the Ore Dock prompting that designation was the presence of the Huletts.[5] The Committee, which counts a relative of George Hulett among its members, was formed for the purpose of attempting to preserve the Huletts.

The Cleveland Bulk Terminals (the "CBT"), located adjacent to the Ore Dock on Whiskey Island, are used for processing and handling of bulk cargo, including ore, which comes to Cleveland by boat and is then transported throughout the area and beyond by rail and truck. In 1997, the Port Authority entered into a lease agreement with Oglebay Norton Terminals, Inc., granting Oglebay Norton the authority to use the CBT and surrounding areas for the receipt, storage, processing, loading and unloading of waterborne cargo and to operate the Ore Dock as an industrial dock to facilitate that transfer process. The Port Authority agreed to maintain and oversee the docking facilities themselves and the lease agreement expressly recited that, although the Huletts were located on the leased premises, the Port Authority would retain all authority over and responsibility for them. The lease agreement also contained the parties' acknowledgment that the Huletts were not, as of that point in time, operational.

---

3. The Court emphasizes that only a portion of the attorney's fees and costs plaintiffs incurred in this litigation are recoverable. Plaintiffs asserted a number of legal theories which had no merit, and three times asked for preliminary injunctive relief with no legitimate basis for doing so. Plaintiffs, thus, have only succeeded on the very narrow claim upon which the Court now grants relief. The Court will not, therefore, award any attorneys fees or costs in connection with plaintiffs' earlier, unsuccessful efforts.

4. There are currently four Huletts in existence. Two are located on the shores of Lake Michigan in Chicago, Illinois. As will be discussed below, the other two are in storage here in Cleveland, after having been removed from the Ore Dock.

5. The Huletts have not been designated a National Historic Landmark.

At about this same time, the Port Authority commissioned an architectural and engineering study of all the Cleveland-area port facilities, including those on Whiskey Island. The study concluded, among many other things, that the continued presence of the Huletts on the Ore Dock limited the operations of the CBT "by restricting cargo transfer activities and ... inhibiting any type of transhipment vessel to vessel cargo transfer." The study concluded that the "model" use of the facility was a use which allowed for full dockside access in front of the CBT—i.e., a use with the Huletts no longer in their then-current location.

In 1998, the Port Authority adopted a Master Plan contemplating long-term improvements to its facilities. The Master Plan essentially endorsed the recommendations of the previously-commissioned study of the Port Authority facilities, including those relating to the CBT and the Huletts. Thereafter, the Port Authority embarked on an improvement project for Whiskey Island whose stated objective was to "increase the capacity and operational flexibility of the bulk handling facility" and to "increase the economic development and job creation potential of the [CBT's] facility." The project contemplated the removal of the Huletts from the dock facilities and the destruction of certain other structures which had been used primarily as support facilities for the Huletts when the Huletts were in operation.

In the fall of 1998, the Port Authority commissioned a "Historic Preservation Mitigation Plan" to assess ways to mitigate the effects of its proposed improvement project on the historic structures on Whiskey Island, including the Huletts. The Committee was invited to participate in this study and to provide comments regarding its recommendations. The Port Authority then submitted its mitigation plan to the Cleveland Landmarks Commission, along with a request that the Commission approve renovation of the dock facilities, including the destruction of three of the four Huletts. The Port Authority proposed the dismantling of the last of the Huletts for relocation to another site and the expenditure of funds for education programs regarding the Huletts and their historical significance.

After public comment and a hearing, the Landmarks Commission granted the Port Authority's request, subject to an agreement that the Port Authority would dismantle two, not one, of the Huletts and store those machines for future reassembly by historic preservationist or educational groups. Although the Committee appealed this decision to Cleveland's Board of Zoning Appeals, after a hearing, the decision of the Landmarks Commission was affirmed.

While this process was ongoing, the Ore dock and CBT remained in use and continued to serve as a transfer point for moving bulk goods from vessels to railcars and trucks for shipment. Boats, accordingly, continued to dock at and unload from an area in front of the CBT and adjacent to the portion of the Ore Dock on which the Huletts were located. By virtue of the 1997 lease agreement, Oglebay Norton remained in control of the CBT operations and the Port Authority retained authority over and responsibility for maintenance of the docking facilities. To carry out its responsibilities, the Port Authority, among other things, historically has conducted maintenance dredging of the area alongside the Ore Docks, so as to sustain the draft depth necessary for vessel traffic, and historically has been granted the authority to do so by the Corps.

In March of 1999, the Port Authority submitted an application to the Corps, seeking a permit to again conduct dredg-

ing alongside the Ore Dock. It is this permit which is at the heart of this litigation.

In describing its permit request, the Port Authority said it was seeking authority to conduct maintenance dredging only. The Port Authority asserted that its request was "not part of the proposed expansion" and, instead, was intended to allow for maintenance of "previously approved draft depth." (March 12, 1999 letter from the Port Authority to the Corps). The Port Authority expressly stated that its improvement project for Whiskey Island "could proceed without the maintenance dredging project." (Id.). The Port Authority did not, however, initially limit its permit request to that area where dredging previously had been conducted. Rather than seek a permit for the 600 foot area traditionally dredged, the Port Authority sought permission to dredge a 2000 foot area along the dock. And, the Port Authority indicated its belief that future actions under its Master Plan would require additional permits from the Corps. (Id.).[6]

The Corps submitted the Port Authority's permit request to various agencies for review. While those environmental agencies to whom the permit was submitted expressed no concern, various agencies with oversight over historic preservation questions did do so, as did the plaintiffs in this case. Thus, the Corps' administrative record reflects substantial contact during the months of March, April and May of 1999 with plaintiffs and the Ohio State Historic Preservation Office [the "Ohio SHPO"].[7] The concerns expressed by these individuals and entities all centered on the impact this proposed dredging permit might have on the Huletts; if the purpose or effect of the dredging was to ready the Ore Dock for anticipated expansion, the plaintiffs and the Ohio SHPO believed that a full assessment of the effect of the expansion would be required under the NHPA.

The Corps, through employee Steven Metivier, discussed these concerns with representatives from the Port Authority and sought clarification of the Port Authority's request. Mr. Metivier explained to the Port Authority that any proposed dredging that exceeded the area of "historic" dredging—that is, dredging that the Corps had approved in the past—would likely be considered part of the dock expansion and would necessitate a § 106 review under the NHPA.[8] The Corps told the Port Authority that an application requesting dredging for only those areas historically dredged likely would not require § 106 review before a permit could issue, because such a request would not further

6. It is unclear whether this last reference related to anticipated future permits for the Whiskey Island improvement project or was simply a reference to an anticipated need relating to the *other* Cleveland-area facilities to be upgraded under the Master Plan.

7. The Ohio State Historic Preservation Office is an agency which helps federal agencies, in the state of Ohio, carry out their historic preservation responsibilities under the NHPA. *See* 16 U.S.C. § 470a(b)(3); 36 C.F.R. § 800.1(c)(ii) (1998).

8. Section 106 is the shorthand name, taken from the congressional bill number, for a federal review process under the NHPA. Section 106 requires any federal agency to take responsibility for the impact of their decisions on historic resources. *See* 16 U.S.C. § 470f. Under § 106, federal agencies are prohibited from approving any federal "undertaking" (including the issuance of any license, permit, or approval), *see id.* at § 470w(7), without (1) taking into account the effects of the undertaking on the historic properties, and (2) affording the Advisory Council on Historic Preservation ["ACHP"] a reasonable opportunity to comment on the undertaking. *See id.* at § 470f. The exact regulations implementing § 106 review will be discussed later on in the opinion.

or facilitate *expansion,* as distinct from maintenance, of the CBT. The Corps also emphasized, however, that if any additional dredging or bulkhead work was necessary, in areas beyond those historically dredged, the Port Authority was required to include it in its initial application and to submit to a § 106 review before any further work could be conducted on its improvement project. The Corps pointed out that permits subsequently requested could be rejected on grounds of anticipatory demolition under § 470h–2(k) of the NHPA.

In early May, 1999, the Port Authority responded to the Corps' concerns by indicating that it intended to scale-back its permit request to cover only the 600 foot area historically dredged; the Port Authority assured the Corps that it had no intention of seeking further authority to dredge areas alongside the dock. The Port Authority explained that its desire was to maintain the current docking capacity in front of the CBT, which was impossible without dredging because of the unusually low water levels in Lake Erie.

On May 13, 1999, the Port Authority revised its permit application in writing and scaled back its request from a 2000 by 60 foot area to a 600 by 25 foot area. The Port Authority formally assured the Corps that no additional dredging or bulkhead work was anticipated. Later that same day, Mr. Metivier called Mark Epstein of the Ohio SHPO, told him of the modified permit and explained that the dredging was confined to an area in current use by vessels, where dredging had been authorized as early as 1979.[9] According to the Administrative Record, Mr. Epstein indicated on the telephone that he was pleased with the reduced dredging area and did not object to the permit.

Shortly after that conversation, still on May 13, Mr. Metivier recommended that a Letter of Permission—a method of issuing a permit allowed under the Corps' regulations, for those projects that are non-controversial and unlikely to spark public comment—be issued to the Port Authority, allowing dredging in the reduced area. Mr. Metivier based this recommendation on his conclusions that (1) the requested dredging work only provided for the maintenance of current draft depth for the existing CBT, and was not an expansion of the deep draft area in front of the CBT, (2) there were no standing objections from environmental agencies, (3) the project would have no more than minimal impact on the aquatic environment, and (4) the dredging was necessary in order to keep the CBT open in its current configuration.

On May 14, 1999, the day after the revised permit application was received, the Corps issued a Letter of Permission (1999–01471(0)) to the Port Authority authorizing dredging in the 600 by 25 foot area. The Letter of Permission remains in effect through May 14, 2004.

On May 17, 1999, three days after the permit had been issued, the Corps, through Mr. Metivier, sent a letter to the Ohio SHPO stating the Corp's belief that issuance of the permit would have "no effect" on the historic Ore Dock or the destruction of the Huletts. It was, and remains the Corps' position that the Whiskey Island improvement project was not within the scope of the revised permit. The Ohio SHPO received the letter on May 20, 1999. On June 2, 1999, both the Ohio SHPO and the ACHP responded by fax to the Corps' letter and stated that they objected to the "no effect" determina-

9. Mr. Metivier provided this same explanation by phone to some of the plaintiffs in this matter as well as to other interested parties.

tion, pursuant to 36 C.F.R. § 800.5(b) (1998). The ACHP directed the Corps to suspend the permit until a § 106 review had been performed. The Corps did not take any action pursuant to these comments or directives, and neither the ACHP, the Ohio SHPO, nor the plaintiffs in this matter took any action to attempt to force the Corps to comply with the ACHP's directive.

On June 5 and 6, 1999, after the ACHP had directed the Corps to suspend the permit, the Port Authority performed the dredging pursuant to the permit.

On June 21, 1999, the Corps responded to the letters from the Ohio SHPO and ACHP, and reiterated the Corps' position that the dredging requested and authorized was for mere maintenance of the historic and currently used deep draft zone and was neither part of nor necessary to the proposed dock expansion. Therefore, the Corps concluded that the demolition of the Huletts and other historic buildings taking place on land was not part of the "permit area." For this analysis, the Corps relied on its own regulations, 33 C.F.R. Part 325, Appendix C, § 1(g)(1), to define the area subject to review. The Corps also informed the Ohio SHPO and the ACHP that the dredging was complete.

Two months later, on September 28, 1999, the ACHP wrote a letter to the Corps, stating that it believed the Corps had violated § 106 of the NHPA, because it issued the Letter of Permission without waiting fifteen days for comment from the Ohio SHPO. The ACHP further noted that it appeared that the Corps allowed the Port Authority to "segment" the project by only allowing dredging of part of the originally requested dredging area, leading the ACHP to conclude that the Port Authority would request the remainder of the dredging after the Huletts and other his-

toric structures had been demolished. As the Huletts would already be destroyed at the time of any future request, the ACHP feared it would be foreclosed from commenting on any future projects at the CBT. There is no record of any response by the Corps to this letter.

In late November of 1999, the Port Authority and Oglebay Norton contracted with Signature Services to demolish two of the Huletts and to dismantle and store the other two. As mentioned earlier, this contract was approved by the Cleveland Landmarks Commission. It was, moreover, entered into pursuant to demolition permits issued by the City of Cleveland and the State of Ohio.

Plaintiffs first sought to enjoin the Port Authority from removing the Huletts from Whiskey Island by filing an action in state court, alleging that the Port Authority violated state law and various local ordinances by contracting with Signature Services. That action was dismissed for failure to state a claim upon which relief could be granted. The state Court of Appeals, thereafter, affirmed the trial court's dismissal. As noted, plaintiffs also appealed the decision of the Cleveland Landmarks Commission to the Cleveland Board of Zoning Appeals. After a hearing, that appeal was also dismissed.

It was not until December 13, 1999, more than six months after the dredging permit had issued, the Ohio SHPO and ACHP had objected, and the dredging had been completed, that plaintiffs sought a remedy in this Court. As described below, plaintiffs' primary objective in filing suit here, like its state court and local administrative efforts, was to stop the Port Authority from demolishing or displacing the Huletts.

## II. Procedural History

On December 13, 1999, plaintiffs initiated this action by filing a Motion for a

Temporary Restraining Order, asking the Court to enjoin the Port Authority, Oglebay Norton Co., and Signature Services, Inc. (the "private party defendants") from destroying the Huletts. Plaintiffs premised this request on their contention that the dredging permit was issued in violation of the NHPA. While the plaintiffs named the U.S. Army Corps of Engineers, Lt. General Joe Ballard, and District Engineer Mark Fierstein (the "federal defendants") in their original complaint, they did not seek any injunctive relief against these federal defendants. Indeed, plaintiffs complaint did not seek any relief whatsoever, injunctive or otherwise, against the federal defendants.

On December 15, 1999, two days later, the Court held a hearing on plaintiffs' Motion for a Temporary Restraining Order. The Court found that it could not enjoin the private party defendants under the authority of a federal statute that only applied to federal entities absent a showing of substantial federal involvement in the activity of those private parties. *See Gettysburg Battlefield Preservation Association v. Gettysburg College,* 799 F.Supp. 1571, 1576 (M.D.Pa.1992) (holding that, in order to enjoin non-federal defendants premised on federal defendant's statutory violations, plaintiff must show (1) the project involved a major federal action, and (2) there remains continuing agency involvement in the project such that termination or modification of agency involvement would terminate or significantly impact the project); *The Environmental Rights Coalition, Inc. v. Austin,* 780 F.Supp. 584, 595 (S.D.Ind.1991) (same). The Court concluded that, even if it were true that the dredging permit impacted the Huletts, because all of the dredging contemplated under the permit had been completed over six months before, there was no continuing federal involvement in the dredging project. The Court also found that, as of December 1999, there was no federal involvement, *i.e.* no federal money, no federal permit, etc., that was necessary for or contemplated in connection with any aspect of the Whiskey Island improvement project. The Court, therefore, denied the Temporary Restraining Order.

The Court indicated, moreover, that, in the absence of ongoing federal involvement in their conduct, plaintiffs likely could not state a claim against the private party defendants because, as non-federal entities, the NHPA did not apply to them. The Court gave plaintiffs five days to show cause why the Court should not dismiss the private party defendants. On December 22, 1999, plaintiffs filed a reply to the Court's Show Cause Order. The private party defendants also filed memoranda addressing the Court's Order, seeking dismissal of all claims asserted against them.

On January 27, 2000, the Court held a conference call with all of the parties to schedule a hearing on plaintiffs' remaining request for a preliminary injunction and on the issues raised by the Show Cause Order. The Court offered to hold a hearing the following week, but plaintiffs, knowing that final demolition or removal of the Huletts was scheduled for early February, requested a later date.

On January 19, 2000, the Court received a Motion from the National Historic Trust asking leave to participate in the proceedings as Amicus Curiae. The Court granted that motion at the preliminary injunction hearing.

On February 15, 2000, the preliminary injunction/show cause hearing was held as scheduled. At the hearing, because plaintiffs could not show that any further federal involvement, including dredging, was necessary or even contemplated with regard to the removal of the Huletts, the

Court determined that plaintiffs had not stated a claim upon which relief could be granted against the private party defendants, and dismissed them from the action. This ruling mooted any request for injunctive relief as to those private party defendants.

This left the Corps and its two employees, Lieutenant Joe Ballard, and Mark D. Fierstein, as the remaining defendants in the case. As plaintiffs had not requested *any* relief from these federal defendants, the Court denied plaintiffs' Motion for a Preliminary Injunction. Surprisingly, though the Court noted plaintiffs' failure to seek any relief against the federal defendants when it denied plaintiffs' request for a Temporary Restraining Order in December, 1999, plaintiffs did not seek to amend their complaint at any time prior to the Preliminary Injunction Hearing in February, 2000 and did not seek to do so during the hearing.

After the preliminary injunction hearing, plaintiffs finally amended their complaint. In their amended complaint, plaintiffs allege that the Corps violated its own regulations when it issued a Letter of Permission allowing the Port Authority to dredge the area in front of the Huletts. Plaintiffs also allege that they were harmed by being denied their right, under the ACHP's and the Corp's regulations, to participate in the § 106 review and the Corps' permitting process. The plaintiffs, therefore, added to their prayers for relief requests that the Court declare that the Corps violated the NHPA, revoke the permit and force the Corps to undergo a § 106 review process and allow public participation in that process.[10]

On May 3, 2000, plaintiffs filed a second Motion for a Temporary Restraining Order, this time asking the Court to order the Corps to suspend immediately all unexpired permits issued to the Port Authority, to withhold the issuance of any new permits requested by the Port Authority, and to refrain from funding, performing, or allowing to be performed, any dredging, repairs, or any other work on behalf of the Port Authority *at any site in the Cleveland area*. The Court held a hearing on May 9, 2000, and determined that there were no exigent circumstances and no irreparable injury to the plaintiffs which would allow the Court to issue a temporary restraining order at that time. The Huletts had already been taken down and the Court had already determined that, given the nature and timing of the claims plaintiffs asserted in this action, it did not have the authority to stop their destruction. There was, moreover, unrebutted evidence in the record that no further dredging was contemplated under the permit plaintiffs contend was issued in violation of the NHPA. Thus, to the extent the Court could grant any relief for the plaintiffs' loss of their right to public comment under the NHPA or the Corps' own regulations, that relief could be granted after a full trial, allowing time for adequate preparation by all parties. The Court also pointed out that it believed that the remedy plaintiffs sought, a revocation of all permits issued to the Port Authority—even those permits which had been in place well before the removal of the Huletts and were for areas geographically distant from Whiskey Island—was too broad. The Court, therefore, denied plaintiffs' second request for a Temporary Re-

---

**10.** Plaintiffs also seek other forms of relief, such as an order that the Corps finance the rebuilding of the Huletts, or that the Corps revoke all permits issued to the Port Authority for *any* Cleveland-area facility, including those geographically distant from Whiskey Island.

straining Order and set the matter for trial.

Defendants notified the Court that they planned to file a Motion for Summary Judgment. Plaintiffs, however, filed a Motion for Summary Judgment first, on June 21, 2000. Defendants filed their Motion for Summary Judgment on June 27, 2000. Because the parties agreed there were no issues of material fact which prevented the matter from being decided as a matter of law, the Court postponed the trial pending a ruling on the Summary Judgment Motions.

On July 17, 2000, the National Trust for Historic Preservation asked for leave to participate as Amicus Curiae in support of plaintiffs' Motion for Summary Judgment and in opposition to defendants' Motion for Summary Judgment. The Court granted that Motion, and the Trust submitted further briefing on those issues.

Plaintiffs currently bring three claims against the Corps. Plaintiffs allege: (1) the Corps violated the National Historic Preservation Act ["NHPA"], 16 U.S.C. § 470f, and Advisory Council on Historic Preservation Regulations at 36 C.F.R. Part 800, by granting a dredging permit to the Port Authority to dredge Lake Erie in front of the four Hulett Ore Unloaders without conducting a § 106 review to determine whether issuing the permit would affect the preservation of the Huletts; (2) the Corps violated § 470h–2(k) of the NHPA by allowing the Port Authority to unlawfully "segment" its application for dredging by only asking for part of the dredging it contemplated under its "Master Plan;" and (3) the Corps violated its own regulations by not allowing public comment during the permitting process, by issuing a permit through the abbreviated process of a "Letter of Permission," and by granting the Port Authority a permit pursuant to an incomplete application.

### III. *Law and Argument*

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein . . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions

on file. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.,* 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989) (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus,* 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is

some metaphysical doubt as to material facts. *Id.*

In making its determination, the Court reviews the Administrative Record for the Letter of Permission (1999–01471(0)) issued to the Port Authority for the dredging in front of the CBT. *See Sierra Club v. Slater,* 120 F.3d 623, 638 (6th Cir.1997) ("As a general matter, courts confine their review to the administrative record, which includes all materials complied by the agency that were before the agency at the time the decision was made.") (citations omitted).

## A.

■ The facts in this case merit a threshold inquiry into the question of mootness. The permit which plaintiffs attack was issued in May, 1999, and the dredging authorized by that permit was completed shortly thereafter. The Port Authority asserts that it has no intention of further dredging in the permitted area and plaintiffs have proffered no evidence indicating that the Port Authority's assertion is untrue. The historic properties which plaintiffs claim the Corps should have considered prior to issuing the permit have, moreover, already been destroyed or relocated. It would seem, accordingly, that there is little left for this Court to address.

■ Article III of the U.S. Constitution dictates that this Court must have a justiciable case or controversy before it in order to address the issues presented. It is the continuing obligation of this Court to assess the justiciability of the claims before it because "[t]he mootness inquiry must be made at every stage of a case." *McPherson v. Michigan High Sch. Athletic Ass'n,* 119 F.3d 453, 458 (6th Cir.1997) (en banc). Under the "case or controversy" requirement, this Court has no authority to issue a decision which would not

affect the rights of the litigants. "The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties." *Id.* (internal quotation omitted). *See also Southwest Williamson County Community Ass'n, Inc. v. Slater,* 243 F.3d 270, 2001 WL 245779, *3 (6th Cir. March 14, 2001).

All parties agree that the only controversy left before this Court is whether the Corps correctly or incorrectly issued the dredging permit to the Port Authority. If the permit had expired upon completion of the dredging, the permit itself, and any work done pursuant to it, would be in the past. As plaintiffs do not claim compensatory damages, and seek only declaratory and injunctive relief, the Court could do nothing to rectify the wrongful issuance of this permit, as the permit would no longer be in existence and no work could be performed pursuant to it. Under such circumstances, the matter would be moot and the Court would be required to dismiss it.

█ The permit, however, remains in effect until May 14, 2004. Thus, although the record indicates that no further dredging is contemplated, it *theoretically* could occur. Generally, "a suit is moot only when it can be shown that a court cannot even 'theoretically grant' relief," *Vieux Carre Property Owners v. Brown,* 948 F.2d 1436 (5th Cir.1991). Accordingly, the Court will not cease consideration of plaintiffs' claims on mootness grounds. It will, instead, proceed on the assumption that a viable permit remains in effect which, if issued in violation of law, could and should be subject to revocation.

█ While mootness may not bar the Court from addressing plaintiffs' claims, however, the Court's remedial authority is far more circumspect than plaintiffs believe. As the Corps contends and the amicus brief concedes, if the Court finds the permit was authorized in violation of the NHPA, the only action the Court can take is to order that the permit be revoked. The remaining aspects of plaintiffs' prayer, including a request that the Corps revoke all permits issued to the Corps—even those unrelated to the CBT improvement project or to the permit at issue here—and a request that the Corps finance the rebuilding of the Huletts are neither warranted by the plaintiffs' allegations, nor within the scope of this Court's authority under the NHPA.

## B.

Under the NHPA, it is the policy of the federal government to "foster conditions under which our modern society and our prehistoric and historic resources can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations." 16 U.S.C. § 470–1(1). *See Tyler v. Cuomo,* 236 F.3d 1124, 1128 (9th Cir.2000). Section 106 of the NHPA requires that, whenever a federal agency has "direct or indirect jurisdiction" over a project or program that could affect historic properties, the federal agency must study ways to avoid or mitigate any adverse impacts to those properties and afford the ACHP a "reasonable opportunity to comment." 16 U.S.C. § 470f. The NHPA is, thus, a precatory statute; the federal agency authorizing the undertaking has the ultimate authority to decide whether or not to proceed with the undertaking. The NHPA forces an agency, however, to stop and consider the consequences of its undertakings on any historic property, and assures that the agency does so by requiring it to receive comment from the ACHP, or agencies acting in its stead, and from the public before proceeding with any such undertaking.

Plaintiffs claim that the Corps violated the NHPA and the ACHP regulations promulgated pursuant thereto when it issued the dredging permit to the Port Authority in May, 1999. Plaintiffs assert this claim pursuant to a private right of action which arises under the NHPA. *See Tyler v. Cisneros,* 136 F.3d 603, 608 (9th Cir.1998) (finding private right of action under the NHPA); *Boarhead Corp. v.. Erickson,* 923 F.2d 1011, 1017 (3rd Cir.1991) (recognizing that, because the NHPA awards attorneys fees for any civil action brought in a United States District Court, a private right of action must exist under the NHPA); *Brewery Dist. Soc'y. v. Fed. Highway Admin.,* 996 F.Supp. 750, 756 (S.D.Ohio 1998) (holding that plaintiffs have a private right of action under the NHPA to ensure compliance with the provisions of that statute). Because this claim is asserted directly under the NHPA, the Corps is not entitled to the more deferential arbitrary and capricious standard of review provided by the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706.

### 1.

■ Plaintiffs contend that the Corps violated 16 U.S.C. § 470f, and the regulations promulgated to implement that Act, 36 C.F.R. § 800.1—800.15, because the Corps did not properly "take into account the effect of the undertaking" on the destruction of the Huletts, and did not afford the ACHP, the Ohio SHPO, and the general public, a reasonable opportunity to comment. The Court agrees.

In order to comply with the NHPA, a federal agency considering an undertaking must go through the process outlined in the ACHP's regulations. *See* 36 C.F.R. § 800, et seq. First, the regulations require a federal agency to consult with the State Historic Preservation Office ["SHPO"] of the State in which the undertaking is to occur to: (a) determine and

document the area of potential effect; (b) identify historic properties within the scope of potential effects; and (c) determine whether those properties are listed in or eligible for listing in the National Register of Historic Places. *See* 36 C.F.R. § 800.4. If the Corps decides that there is "no effect" on any historic property, the Corps must submit that finding to the SHPO and interested persons who have made their concerns known to the agency official. *See* 36 C.F.R. § 800 .5(b). If the SHPO does not object within fifteen (15) days, the agency official need not take any further steps in the § 106 process and may issue the permit, or perform the activity requested. *See id.* If the SHPO objects, the agency official and SHPO must consult to determine whether there is an "adverse effect," and must undertake a number of additional steps, including, among others, submitting the matter to or consulting with the ACHP, inviting public comment, participating in a public hearing and documenting its findings.

There is no dispute that the Huletts have been on the National Register of Historic Places since 1997. There is also no dispute that the Corps contacted the Ohio SHPO to discuss whether the Huletts would be in the area of "potential effect" if the Corps were to issue the dredging permit originally requested by the Port Authority. And, it is clear from the administrative record that the Corps received and responded to public input regarding the impact of the permit on the Huletts from, among others, the plaintiffs themselves. The dispute in this matter centers on what the Corps did, and what it did not do, next. After identifying the issue—i.e ., the presence of the Huletts in an area upland of that to be dredged—and consulting interested parties, the Corps concluded that the dredging activity would have "no effect" on the Huletts. Indeed, the Corps deter-

mined that the expansion activities involving the CBT, including potential removal of the Huletts, were not even "within the permit area" of the dredging application, once the application was narrowed to the 600 feet necessary to maintain the CBT's current operations. The Corps argues that, having consulted with interested parties and considered their concerns, it was free to make its own determination regarding the impact of the permit on any historic properties, including the Huletts. The Corps contends, moreover, that its conclusion that the Huletts lay outside any zone of effect was a reasonable one.

The Corps may be correct that the dredging under the permit at issue here had no effect on the ultimate removal of the Huletts from Whiskey Island. The Corps is also correct that the ultimate decision whether to issue a permit lay with the Corps, and not the ACHP. The Corps is not correct, however, that it was free to reach those conclusions without further, and more formal, dialogue with the Ohio SHPO, the ACHP and the public.

An agency's obligations do not end with its own conclusion of no effect, even if that finding is made after "consultation" with the SHPO and the public. If a federal agency proposes a finding of no effect, it must document its findings in publicly available materials, notify the relevant SHPO and allow fifteen days for a response. Only if the SHPO fails to object within that time frame may the agency proceed to act without further consultation under the NHPA. If the SHPO does object, additional steps in the § 106 process must be taken, including, at minimum, submission of the issue to the ACHP, either in the form of an agreement with the SHPO of no adverse effect, or in the form of a request for a full thirty (30) day review by the ACHP.

None of these formal notification procedures occurred prior to issuance of the Port Authority permit. Indeed, as plaintiffs point out, the Corps issued the dredging permit (1) before formally notifying the Ohio SHPO or the Council of its proposed finding of "no effect" (2) before properly documenting its findings, and (3) without waiting the necessary fifteen (15) days for the Ohio SHPO to respond to the finding of "no effect." Having taken this precipitous action, moreover, the Corps then ignored both the Ohio SHPO's and the ACHP's objections to the Corps' finding of "no effect," even though those objections were timely made and were received by the Corps before any work under the permit had been performed.

In response to these concerns, the Corps relies on the fact that, on May 13, 1999, Stephen Metivier spoke with Mark Epstein of the Ohio SHPO on the telephone about the revised permit application and Mr. Epstein indicated he was pleased with the reduced dredging area and did not object to the permit. The Corps contends that Mr. Epstein's indication of no objection to the dredging is tantamount to approval by, or at least "no objection" from, the Ohio SHPO. The Corps contends that it should have been permitted to act on Mr. Epstein's approval, without worrying whether that approval would be revoked in the future.

The Corps argues that it made a finding of "no effect," that is, that the dredging in the historically dredged area would not affect the demolition of the Huletts, after consulting with the Ohio SHPO and, thus, was free to proceed with the permitting process. The Corps is mistaken, however; it places too much reliance on the telephone "authorization" by Mr. Epstein. The regulations contemplate a far more formal procedure, which includes, at minimum, written notification to the relevant

SHPO accompanied by documentation supporting the agency's finding, followed by a waiting period of fifteen (15) days. Quite simply, while the Corps may have thought its decision was both a considered and correct one, it was one which impermissibly truncated the consultation process mandated by the NHPA and the regulations promulgated thereunder. After having circumvented the process, moreover, the Corps failed to revoke the permit once formal objections were received from both the Ohio SHPO and the ACHP. The Court is compelled to conclude, accordingly, that the Corps violated the ACHP regulations, and hence the NHPA, when it issued the dredging permit to the Port Authority which is the subject of this action.

### 2.

█ The Corps contends that the Court is *not* compelled to conclude that it violated the NHPA merely because the Court finds that the Corps failed to comply with the ACHP regulations set forth at 36 CFR § 800.1 *et seq.* The Corps argues that those regulations do not govern its permitting process. Because the Corps has adopted regulations governing its own authority and obligations, including those under the NHPA, the Corps contends it is against these regulations which its actions should be judged. The Corps asserts, moreover, that, when the Court assesses the Corps' actions in light of its own regulations, set forth at 36 C.F.R. § 325 Appendix C., the Court must apply the deferential standard of review dictated by the Administrative Procedures Act. *See* 5 U.S.C. § 706 *et seq.*

The Corps contends that it was authorized by its own regulations to interpret the "permit area" narrowly when considering the impact of the permitted activity on historic properties and that it was justified in issuing the permit without "formal" notification of its intention to do so to the Ohio SHPO. The Corps argues that, given the nature of the permit ultimately sought and the Corps' extensive consultation with all relevant agencies and interested parties, its decision to issue the permit was, even if not in technical compliance with the ACHP regulations, not arbitrary and capricious under its own.

The Corps is correct that the NHPA permits agencies to promulgate regulations governing their own programs and to set forth in those regulations methods for compliance with the NHPA. The NHPA commands that such regulations be "consistent" with those issued by the ACHP, however, which is expressly authorized to promulgate comprehensive regulations under the Act. *See* 16 U.S.C. § 470h–2(a)(2)(E)(i). *See Nat'l Ctr. for Preservation Law v. Landrieu,* 496 F.Supp. 716, 742 (D.S.C.) aff'd. per curiam, 635 F.2d 324 (4th Cir.1980) (holding that the ACHP has exclusive authority to determine the methods for compliance with NHPA); *Nat'l Trust for Historic Preservation v. U.S. Army Corps of Engineers,* 552 F.Supp. 784, 790–91 (S.D.Ohio 1982) ("holding that the ACHP's regulations govern the implementation of § 106 for all federal agencies"); 16 U.S.C. § 470s (the ACHP may "promulgate such rules and regulations as it deems necessary to govern the implementation of [Section 106] . . . in its entirety.").

The ACHP regulations themselves also authorize the issuance of counterpart regulations. Again, however, that authority is limited to regulations which are adopted in consultation with *and are approved by* the ACHP. *See* 36 C.F.R. § 800.15.[11]

---

11. This regulation provides: "[i]n consultation with the Council, agencies may develop counterpart regulations to carry out the section 106 process. When concurred in by the

All parties agree that there is no record of the ACHP ever approving or concurring in the Corps' regulations. The Court has already found, moreover, that, to the extent the Corps' regulations allow it to issue a permit in the absence of the formal consultation, notification and objection procedures outlined in the ACHP regulations, the Corps' procedures are inconsistent with, and indeed, in derogation of those ACHP regulations. The Corps, accordingly, cannot rely on its own regulations to define the scope of its notice obligations or to define the "permit area" governing the circumstances giving rise to those obligations. *See, e.g., Colo. River Indian Tribes*, 605 F.Supp. at 1437 (finding that the U.S. Army Corps of Engineers could not rely upon its own regulations, under 33 C.F.R. § 325, App. C, in place of the ACHP's regulations, because the "permit area" was more narrowly defined than the area to be considered under the ACHP's regulations.).[12] Because the Corps cannot rely on its own regulations to determine compliance with the NHPA in the circumstances at issue in this case, moreover, the Corps' argument that it did not arbitrarily and capriciously violate its own regulations does not affect the Court's determination that the Corps violated the NHPA.

## C.

■ Plaintiffs also allege that the Corps violated § 470h–2(k) of the NHPA because it issued a permit to the Port Authority for only part of the dredging originally requested. Plaintiffs assert that the Port Authority needed a permit for the rest of the originally requested dredging area to complete the CBT improvement project, but only asked for part of the dredging it required in order to avoid the § 106 review process. Plaintiffs believe that, now that the Huletts have been demolished and § 106 review is less meaningful, the Port Authority will apply to the Corps for additional permits. Plaintiffs contend that the Corps knew or should have known that the Port Authority was attempting to skirt the § 106 review process when it reduced its application from a 2000 foot area to a 600 foot area and that the Corps should have refused to issue a permit for that reduced area without going through the full § 106 process.

The plaintiffs, however, misread § 470h–2(k). § 470h–2(k) provides:

> Each Federal agency shall ensure that the agency will not grant a ... permit, license or other assistance to an applicant who, with intent to avoid the requirements of section 470f of this titles, has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, allowed such significant adverse effect to occur, unless the agency, after consultation with the Council, determines that circumstances justify granting such assistance despite the adverse effect created or permitted by the applicant.

This section provides only that a federal agency may not grant a permit to an applicant who has *already* adversely affected historic property—i.e., it is a prohibition against granting permits to applicants who have committed anticipatory demolition.

Council, such counterpart regulations shall stand in place of these regulations for the purposes of the agency's compliance with section 106." *See* 36 C.F.R. § 800.15.

12. The Court makes no determination whether the remainder of the Corps' regulations are consistent with the ACHP's regulations. *See, e.g., Sierra Club v. Slater*, 120 F.3d 623, 636 (6th Cir.1997) (finding that the Corps could rely on its own regulations allowing Corps to rely on a lead agency in complying with the NHPA).

Section 470h–2(k) works to punish those who would seek to manipulate the § 106 process by denying them access to post-demolition permits. It does not, as plaintiffs contend, require agencies to presage whether an applicant will ask for permits at some unspecified time in the future. And, it does not authorize denial of a current permit based on *suspicions* that additional permits may be sought.

The record in this case clearly evidences why plaintiffs' interpretation of § 470h–2(k) would be unworkable. Here, the Corps specifically told the Port Authority that the Port Authority must ask for everything it needed in one permit application and warned the Port Authority that later permits could be subject to an anticipatory demolition claim. The Port Authority assured the Corps that no additional dredging permits would be needed for Whiskey Island. The Port Authority, moreover, has not requested any further permits from the Corps relating to its original permit application or to the CBT improvement project in the almost two years that have passed since the permit was issued. It would place an unreasonable burden upon federal agencies to require them to second-guess an applicant's stated intentions, as plaintiffs assert the Corps should have done here. It could, moreover, result in the denial of legitimately sought permits on grounds that amount to mere speculation regarding future intentions.

The Court, similarly, cannot know whether the Port Authority will ask for further dredging or other permits from the Corps relating to its improvement project and, thus, cannot know whether § 470h–2(k) will be implicated in the future. Quite simply, plaintiffs' claim asserting anticipatory demolition under § 470h–2(k) is not yet ripe because the factual predicate to such a claim does not exist.[13]

Ripeness focuses on the timing of the action rather than on the parties who bring the suit. *Peoples Rights Org., Inc. v. City of Columbus,* 152 F.3d 522, 527 (6th Cir.1998). In order to determine whether a case is ripe for review, or ripe for a declaratory judgment, the Court must weigh the following factors: (1) the hardship to the parties if judicial review is denied at the pre-enforcement stage, (2) the likelihood that the injury alleged by the plaintiff will ever come to pass, and (3) the fitness of the case for judicial resolution at this stage. *Id.; Nat'l Rifle Ass'n of Am. v. Magaw,* 132 F.3d 272, 284 (6th Cir.1997); *United Steelworkers, Local 2116 v. Cyclops Corp.,* 860 F.2d 189, 194–95 (6th Cir.1988). The ripeness requirement aims to prevent the court from entangling itself in "abstract disagreements." *Thomas v. Union Carbide Agric. Prod. Co.,* 473 U.S. 568, 580, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985); *Peoples Rights Org., Inc.,* 152 F.3d at 527.

The Port Authority sought its original permit when the Huletts were intact. The permit was issued and the work was done without any change in the character of surrounding historic properties. The Corps and the Port Authority have both told this Court, moreover, that no more work is planned under the existing permit, and that the Port Authority will not require any further permits relating to its improvement of the CBT. There is, accordingly, no basis upon which the Court can declare that the Port Authority engaged in anticipatory demolition under the NHPA

---

**13.** Alternatively, because plaintiffs have not alleged the factual predicate for an anticipatory demolition claim—application for a permit after historic properties are impacted—the Court would be correct in concluding that plaintiffs have failed to state a claim under § 470h–2(k).

prior to issuance of any permit. And, on the record before the Court, there may never be any basis to do so. *See, e.g., National Rifle Ass'n of Am.,* 132 F.3d at 284 ("Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all.").

If the Port Authority were now to request dredging in areas beyond that encompassed by the permit, plaintiffs could seek to invoke § 470h–2(k) to stop the Corps from granting another permit to the Port Authority.[14] Until that occurs, however, plaintiffs' claim under 16 U.S.C. § 470h–2(k) is not ripe.[15] The Court, therefore, will dismiss those claims.

### D.

As the Court explained above, because it has found that the Corps issued the dredging permit in violation of the NHPA by failing to wait for comments from the Ohio SHPO or the ACHP, and then failing to continue to pursue the § 106 process after those entities objected, there is no need to reach the plaintiffs' alternate arguments that the Corps violated the Corps' own regulations. The Court can provide no additional relief to the plaintiffs for those alternate claims, and sees no need to go through the exercise of determining those claims when a decision either way would have no effect, practically or theoretically, on either party.[16]

### IV. CONCLUSION

Accordingly, defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part.** (Docket no. 40). The Court finds for the Corps on the plaintiffs' claims under 16 U.S.C. § 470h–

---

**14.** The Court expresses no opinion regarding the validity or strength of any such future claim; again, the question is simply not developed sufficiently for the Court to do so.

**15.** Plaintiffs also assert that the Corps violated its own regulations by allowing the Port Authority to "segment" its request for dredging, because the Corps approved an "incomplete application." The regulation upon which plaintiffs rely provides:

All activities which the applicant plans to undertake which are reasonably related to the same project and for which a DA permit would be required should be included in the same permit application. District Engineers should reject, as incomplete, any permit application which fails to comply with this requirement.

33 C.F.R. § 325.1(d)(2). If an applicant requests only part of the work that will be required in a project, in violation of the above regulation, that process is called "segmenting" the application, and results in an incomplete application which should be rejected by the district engineer.

This regulation does not address concepts of historic preservation or anticipatory demolition, however. It is, instead, a mechanism by which the Corps can assure it streamlines its permitting process. An example of "seg-

menting" in this context is a dredging request which fails to include permission to engage in activities such as backfilling or repairs which are necessary for and incident to the dredging. *Id.* The regulation speaks in terms of "segmenting" aspects of a single work project, not in terms of "segmenting" various projects.

Accordingly, although the Court concludes that it need not address the claims premised on alleged violations of the Corps own regulations, the Court would be unlikely to conclude, if it did reach those issues, that the Corps arbitrarily and capriciously violated 33 C.F.R. § 325.1(d)(2) when it authorized the dredging at issue in this case.

**16.** The Court notes, however, that it would be required to afford the Corps great deference in considering those claims; only if this Court found that the Corps acted in an arbitrary and capricious manner in interpreting and applying its own regulations could the Court invalidate actions taken thereunder. *See* 5 U.S.C. § 706(2)(A) & (D); *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 375, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Sierra Club v. Slater,* 120 F.3d 623, *632 (6th Cir. 1997); *Communities, Inc. v. Busey,* 956 F.2d 619, 623 (6th Cir.1992).

2(k), and, dismisses those claims as not ripe. Plaintiffs Motion for Summary Judgment is **GRANTED in part** and **DENIED in part.** (Docket no. 38). The Court finds that the Corps violated the National Historic Preservation Act when issuing the permit to the Port Authority because it did not wait for objections from the Ohio SHPO (or the ACHP) before issuing the permit, and did not proceed with the § 106 review process when those agencies did object. The Court declines to reach the remaining issues concerning the Corps' alleged violation of its own regulations. Plaintiffs' motion to submit additional authority is also **GRANTED.** (Docket no. 50).

Because the plaintiffs have shown that the Corps issued the permit prematurely under the NHPA, the Court grants plaintiffs the following relief: (1) the Corps must immediately revoke the Letter of Permission (No.1999–01471(0)) that it issued to the Port Authority allowing dredging in 600 by 25 foot area on May 14, 1999, and (2) plaintiffs are awarded attorney's fees and costs pursuant to 16 U.S.C. § 470w–4.[17] Plaintiffs' other prayers for relief are denied. Based on these rulings, this action is, hereby, **DISMISSED.**

**IT IS SO ORDERED**

### *ORDER*

For the reasons set forth in the Court's memorandum and order of this date, plaintiffs' motion for summary judgment is **GRANTED in part and DENIED in part.** (Docket no. 38). Defendants' motion for summary judgment is also **GRANTED in**

part and **DENIED in part.** (Docket no. 40). Based on these rulings, this action is, hereby, **DISMISSED.**

**IT IS SO ORDERED**

---

**17.** Plaintiffs must submit their request for attorney's fees, designating the work done and numbers of hours spent on that work to the Court. The Court reserves the right to reduce plaintiffs' request to a reasonable rate and to a reasonable number of hours for the work completed. *See* 16 U.S.C. § 470w–4 ("[T]he court may award attorney's fees, ... and other costs of participating in such action, as the court deems reasonable."). The Court, further, will only grant attorney's fees for the claims on which the plaintiffs succeeded and to the extent plaintiffs' own efforts contributed to that success.